No. 22-2863

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

ELIZABETH ALICEA, et al.,

Plaintiffs-Appellants,

-vs-

COUNTY OF COOK and THOMAS J. DART,

Defendants-Appellees.

---

On Appeal from the U.S. District Court,
Northern District of Illinois, Eastern Division
File Number 18 cv 05381
The Honorable John F. Kness, Presiding.

---

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

---

Thomas A. Zimmerman, Jr.
Matthew C. De Re
Zimmerman Law Offices, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020
Counsel for Plaintiffs-Appellants

**ORAL ARGUMENT REQUESTED**

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>No. 22-2863</u>

Short Caption: <u>Elizabeth Alicea, et al. v. County of Cook and Thomas J. Dart</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Elizabeth Alicea, Michelle Urrutia, Katrina Ramos and Jack Artinian</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Zimmerman Law Offices, P.C.</u>

_____

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>s/ Thomas A. Zimmerman, Jr.</u>    Date: <u>February 15, 2023</u>

Attorney's Printed Name: <u>Thomas A. Zimmerman</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑    **No** ☐

Address: <u>77 West Washington Street, Suite 1220</u>

<u>Chicago, Illinois 60602</u>

Phone Number: <u>(312) 440-0020</u>    Fax Number: <u>312-440-4180</u>

E-Mail Address: <u>tom@attorneyzim.com</u>

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: No. 22-2863

Short Caption: Elizabeth Alicea, et al. v. County of Cook and Thomas J. Dart

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Elizabeth Alicea, Michelle Urrutia, Katrina Ramos and Jack Artinian

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Zimmerman Law Offices, P.C.

(3)     If the party, amicus or intervenor is a corporation:

i)      Identify all its parent corporations, if any; and

N/A

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Matthew C. De Re          Date: February 15, 2023

Attorney's Printed Name:  Matthew C. DeRe

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☐   **No** ☑

Address: 77 West Washington Street, Suite 1220

Chicago, Illinois 60602

Phone Number: (312) 440-0020          Fax Number: 312-440-4180

E-Mail Address: matt@attorneyzim.com

rev. 12/19 AK

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ................................................................. 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ................................. 1

STATEMENT OF THE CASE.................................................................... 2

    I.    FACTUAL BACKGROUND................................................................ 2

    II.   PROCEDURAL BACKGROUND. ........................................................ 4

        A.    The Course of Class-Related Discovery. ....................................... 4

        B.    The Close of Class-Related Discovery.......................................... 6

        C.    Briefing on Plaintiffs' Motions for Class Certification.................. 7

        D.    Briefing on Defendants' Motion for Summary Judgment............ 8

SUMMARY OF THE ARGUMENT ............................................................. 10

APPELLATE STANDARD OF REVIEW....................................................... 10

ARGUMENT ...................................................................................... 11

    I.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY
        JUDGMENT IN DEFENDANTS' FAVOR WITH RESPECT TO
        PLAINTIFFS' SECTION 1983 CLAIM. ................................................ 11

        A.    Plaintiffs Were Each Subject to a Search................................... 11

                1.    The Recognition of a Reasonable Expectation to Privacy
                      Within the Toilet Areas Is Consistent With This Court's
                      Precedent......................................................................... 12

                2.    The Rationale Employed by the District Court With
                      Respect to Plaintiffs' Reasonable Expectation of Privacy
                      Was Manifestly Erroneous. ............................................. 17

3.    The Fact That Plaintiffs Were Recorded With Cameras Does Not Invalidate Their Claims. ................................. 22

4.    Plaintiffs Had a Subjective Expectation of Privacy. ........ 27

B.    The Searches at Issue Were Unreasonable. ................................ 28

1.    The Scope of the Intrusion Was Significant. ................... 28

2.    The Manner of the Intrusion Was Unreasonable. ........... 29

3.    Defendants Lacked Justification for the Searches. ......... 31

4.    The Location of the Searches Supports a Finding of Unreasonableness. ............................................... 39

II.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT IN DEFENDANTS' FAVOR WITH RESPECT TO PLAINTIFFS' INTRUSION UPON SECULUSION CLAIM. ............ 40

III.    THE DISTRICT COURT ERRED IN REFUSING TO GIVE PLAINTIFFS AN ADEQAUTE OPPORTUNITY TO CONDUCT DISCOVERY ........................................................ 40

IV.    THE DISTRICT COURT ABUSED ITS DISCRETION IN CONSIDERING PLAINTIFFS' DISCOVERY RELATED MOTIONS. 44

A.    The District Court Failed to Consider Plaintiffs' Petition for an Award of Attorneys' Fees Brought in Connection with Their First Two Motions to Compel. ..................................... 45

B.    The District Abused Its Discretion in Denying Plaintiffs' Third Motion to Compel, Motion for Sanctions, and Motion to Take Additional Depositions. ............................................. 47

CONCLUSION ............................................................ 50

# TABLE OF AUTHORITIES

### Cases

*Amati v. City of Woodstock, Ill.*,
  829 F.Supp. 998 (N.D. Ill. 1993) .............................................. 23, 26, 30, 40

*Arnzen v. Palmer*,
  713 F.3d 369 (8th Cir. 2013) ................................................ 23, 24, 26, 31

*Barlow v. Herman*,
  2015 WL 846568 (D. Nev. 2015) ........................................................ 45, 46

*Bell v. Wolfish*,
  441 U.S. 520 (1979) ............................................................................ 28, 32

*Calvin v. Sheriff of Will Cnty.*,
  405 F.Supp.2d 933 (N.D. Ill. 2005) .................................................... 29, 32

*Canedy v. Boardman*,
  16 F.3d 183 (7th Cir. 1994) ............................................................... passim

*Capua v. City of Plainfield*,
  643 F. Supp. 1507 (D.N.J. 1986) ............................................ 13, 15, 19, 25

*Carroll v. Vill. of Homewood*,
  2001 WL 1467708 (N.D. Ill. 2001) ........................................................... 12

*Cavalieri v. Shepard*
  321 F.3d 616 (7th Cir. 2003) ..................................................................... 16

*Cummings v. Dart*,
  2022 WL 461987 (N.D. Ill. 2022) .............................................................. 48

*Daugherty v. Page*,
  906 F.3d 606 (7th Cir. 2018) ..................................................................... 41

*David v. Caterpillar, Inc.*,
  324 F.3d 851 (7th Cir. 2003) ..................................................................... 48

*DeShaney v. Winnebago County Dep't of Soc. Servs.*,
  489 U.S. 189 (1989) ................................................................................... 16

*DiLoreto v. Borough of Oaklyn*,
  744 F. Supp. 610 (D.N.J. 1990) ........................................................ passim

*Doe v. Calumet City, Ill.*,
    754 F. Supp. 1211 (N.D. Ill. 1990) ......................................................... 32

*Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*,
    566 U.S. 318 (2012) .............................................................................. 28

*Fonder v. Sheriff of Kankakee Cnty.*,
    823 F.3d 1144 (7th Cir. 2016) ................................................................ 36

*Forbes v. Trigg*,
    976 F.2d 308 (7th Cir. 1992) ............................................................ 13, 18

*Gile v. United Airlines, Inc.*,
    95 F.3d 492 (7th Cir. 1996) ..................................................... 42, 44, 50

*Gustafson v. Adkins*,
    803 F.3d 883 (7th Cir. 2015) .................................................................. 25

*Henry v. Hulett*,
    969 F.3d 769 (7th Cir. 2020) ........................................................... passim

*Horton v. California*,
    496 U.S. 128 (1990) .............................................................................. 38

*Houchins v. KQED, Inc.*,
    438 U.S. 1  (1978) ............................................................................ 14, 23

*Hudson v. Palmer*,
    468 U.S. 517 (1984) ......................................................................... 17, 18

*Johnson v. Phelan*,
    69 F.3d 144 (7th Cir. 1995) ............................................................. 37, 38

*Johnson v. Statewide Investigative Servs., Inc.*,
    2021 WL 825653 (N.D. Ill. 2021) ........................................................... 48

*Jokich v. Rush University Medical Center*,
    2020 WL 2098060 (N.D. Ill. 2020) ......................................................... 48

*Katz v. United States*,
    389 U.S. 347 (1967) ........................................................................ passim

*King v. Ford Motor Co.*,
    872 F.3d 833 (7th Cir. 2017) .................................................................. 48

*Kyllo v. United States*,
    533 U.S. 27 (2001) .......................................................................... 12, 25

*Lanza v. New York*,
 370 U.S. 139 (1962) ................................................................. 38

*Lincoln Diagnostics, Inc. v. Panatrex, Inc.*,
 2008 WL 4330182 (C.D. Ill. 2008) ........................................ 46

*Lopez v. City of Chicago*,
 464 F.3d 711 (7th Cir. 2006) .................................................. 16

*Mary Beth G. v. City of Chi.*,
 723 F.2d 1263 (7th Cir. 1983) ......................................... passim

*Mays v. Springborn*,
 575 F.3d 643 (7th Cir. 2009) .................................................. 34

*McCarthy v. Option One Mortg. Corp.*,
 362 F.3d 1008 (7th Cir. 2004) ......................................... 11, 49

*Mraovic v. Elgin, Joliet & E. Ry. Co.*,
 897 F.2d 268 (7th Cir. 1990) .......................................... 11, 49

*Nat'l Treasury Employees Union v. Von Raab*,
 816 F.2d 170 (5th Cir. 1987) .......................................... 14, 19

*Ortiz v. City of Chicago*,
 656 F.3d 523 (7th Cir. 2011) .................................................. 16

*Peckham v. Wisconsin Dept. of Corr.*,
 141 F.3d 694 (7th Cir. 1998) .................................................. 13

*Perdomo v. Browner*,
 67 F.3d 140 (7th Cir. 1995) .................................................... 10

*Platteville Area Ap't. Ass. v. City of Platteville*,
 179 F.3d 574 (7th Cir. 1999) .................................................. 38

*Rickels v. City of South Bend, Ind.*,
 33 F.3d 785 (7th Cir. 1994) .................................................... 45

*Rodriquez v. Parsons Infrastructure & Tech. Grp., Inc.*,
 271 F.R.D. 620 (S.D. Ind. 2010) ............................................ 45

*Scott v. Harris*,
 550 U.S. 372 (2007) ................................................................. 27

*Skinner v. Ry. Labor Executives' Ass'n*,
 489 U.S. 602 (1989) ................................................................. 15

*Sparks v. Stutler,*
    71 F.3d 259 (7th Cir. 1995) ............................................................ 13, 18

*Sterk v. Redbox Automated Retail, LLC,*
    770 F.3d 618 (7th Cir. 2014) ................................................................ 41

*Tesch v. Cnty. of Green Lake,*
    157 F.3d 465 (7th Cir. 1998) ................................................................ 16

*Tinetti v. Wittke,*
    479 F. Supp. 486 (E.D. Wis. 1979) ...................................................... 33

*United States v. Caira,*
    833 F.3d 803 (7th Cir. 2016) ................................................................ 11

*United States v. Correa,*
    908 F.3d 208 (7th Cir. 2018) ................................................................ 11

*United States v. Langford,*
    688 F.2d 1088 (7th Cir. 1982) .............................................................. 42

*United States v. Mann,*
    592 F.3d 779 (7th Cir. 2010) ............................................................ 38, 39

*United States v. McLeod,*
    493 F.2d 1186 (7th Cir. 1974) .............................................................. 19

*United States v. Paxton,*
    848 F.3d 803 (7th Cir. 2017) ............................................................ 19, 20

*United States v. Scott,*
    731 F.3d 659 (7th Cir. 2013) ................................................ 12, 19, 21, 41

*United States v. Tilmon,*
    19 F.3d 1221 (7th Cir. 1994) ................................................................ 31

*United States v. Tuggle,*
    4 F.4th 505 (7th Cir. 2021) .................................................... 12, 25, 26

*Vernonia Sch. Dist. 47J v. Acton,*
    515 U.S. 646 (1995) .............................................................................. 15

*West v. Dallas Police Dept.,*
    1997 WL 452727 (N.D. Tex. 1997) ...................................................... 16

*Wilkes v. Borough of Clayton,*
    696 F. Supp. 144 (D.N.J. 1988) ..................................................... passim

*Williams v. Rodriguez,*
  509 F.3d 392 (7th Cir. 2007) ................................................................. 17

*York v. Story,*
  324 F.2d 450 (9th Cir. 1963) ........................................................... 16, 30

*Young v. Cnty. of Cook,*
  616 F.Supp.2d 834 (N.D. Ill. 2009) ................................................. 32, 34

*Zimmer, Inc. v. Beamalloy Reconstructive Med. Prod., LLC,*
  2019 WL 1318094 (N.D. Ind. 2019) ....................................................... 46

### Statutes

28 U.S.C. § 1291 .......................................................................................... 1

28 U.S.C. § 1367 .......................................................................................... 1

42 U.S.C. § 1983 ................................................................................. passim

720 ILCS 5/26-4 ........................................................................................ 25

### Rules

Fed. R. Civ. P. 37 ................................................................... 44, 45, 46, 47

Fed. R. Civ. P. 56 ..................................................................................... 41

### Treatises

Restatement (Second) of Torts § 625B (1977) ........................................ 23

## JURISDICTIONAL STATEMENT

This is an appeal as a matter of right from the United States District Court for the Northern District of Illinois. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

The District Court had jurisdiction over this case under 28 U.S.C. § 1331 (federal question) because Plaintiffs-Appellants' ("Plaintiffs") alleged violations of the Fourth and Fourteenth Amendments to the United States Constitution, and asserted claims under 42 U.S.C. § 1983 ("Section 1983"). The District Court also had jurisdiction over Plaintiffs' state law invasion of privacy claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction), as those claims were substantially related to Plaintiffs' Section 1983 claims.

On September 30, 2022, the District Court entered an order ("MSJ Order") granting Defendants-Appellees' ("Defendants") *Motion for Summary Judgment* ("MSJ"), and entered judgment in favor of Defendants ("Entry of Judgment"). (A.2-19). On October 6, 2022, Plaintiffs timely filed their Notice of Appeal. (A.1).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I.     Whether the District Court erred in holding that Plaintiffs lacked a reasonable expectation of privacy while using the toilets in the Holding Cells;

II.    Whether the District Court erred in holding that Defendants had a legitimate security interest in recording Plaintiffs while they used the toilets in the Holding Cells;

III.    Whether the District Court erred in granting Defendants' MSJ with respect to Plaintiffs' Section 1983 claim;

IV.    Whether the District Court erred in granting Defendants' MSJ with respect to Plaintiffs' instruction upon seclusion claim;

V.    Whether the District Court erred in granting Defendants' MSJ without permitting Plaintiffs to adequately complete discovery;

VI.    Whether the District Court erred in refusing to consider Plaintiffs' request for attorneys' fees in connection with successful motions to compel discovery; and

VII.    Whether the District Court erred in refusing to consider Plaintiffs' request for additional time to complete discovery prior to requiring Plaintiffs to engage in briefing on the MSJ.

## <u>STATEMENT OF THE CASE</u>

## I.    FACTUAL BACKGROUND.

Defendant Thomas J. Dart (the "Sheriff"), as Sheriff of Cook County, Illinois ("Cook County" or the "County"), operates pretrial holding cells in Cook County courthouses ("Holding Cells"). (A.26). Recently arrested individuals who are in the Sheriff's custody, but who have not been convicted of the crime for which they are charged ("Pretrial Detainees"), are placed in Holding Cells when they are required to appear at a Cook County courthouse (*e.g.*, for a bond hearing, status hearing, or any other court hearing). (A.26). Many of these Pretrial Detainees have yet to even

appear before a judge for an initial probable cause hearing ("Prehearing Arrestees").[1] (A.93).

Each Holding Cell has a toilet within a toilet area (the "Toilet Area") that is partitioned from outside the cell and inside the rest of the cell. (A.26). Defendants monitor every Holding Cell, including the Toilet Areas therein, with cameras (the "Cameras"). (A.26). These Cameras are capable of recording, and do record, Pretrial Detainees using the toilets in the Toilet Area of the Holding Cells. (A.26).

Pretrial Detainees are not warned or otherwise notified that (1) they are monitored by the Cameras while in the Holding Cells, (2) both male and female deputies monitor the Camera footage from the Holding Cells in real time, and (3) the Cameras record all activity in the Holding Cells, including Pretrial Detainees' use of the toilets within the Toilet Areas therein. (A.26). The video footage from each Holding Cell Camera is recorded and retained for 30 days, and can be accessed and reviewed by male and female employees anywhere in Cook County. (A.26, A.93).

Pretrial Detainees are held in the Holding Cells for many hours at a time. (A.93). As such, they have to use the toilet located in the Toilet Area of the Holding Cells. (A.93). In some instances, if a Pretrial Detainee is wearing a one-piece jumpsuit, he or she must disrobe to use the toilet. (A.93). While the Toilet Areas in the Holding Cells have partitions to give Pretrial Detainees privacy from other people within the

---

[1] Since Prehearing Arrestees are a subset of the Pretrial Detainees discussed herein, any reference to Pretrial Detainees herein should be understood to be inclusive of Prehearing Arrestees, unless otherwise specified.

Holding Cell or Sheriff's deputies looking into the Holding Cell, the Pretrial Detainees in the Toilet Areas are exposed to the Cameras in the Holding Cells, which are shown in real-time on monitors in the courthouses, and can be accessed anywhere in Cook County. (A.93-94).

## II.   PROCEDURAL BACKGROUND.

On August 8, 2018, Plaintiffs filed their Class Action Complaint ("Complaint") against the County and the Sheriff, in his official capacity. (A.8). In the Complaint, Plaintiffs alleged that Defendants' policy of monitoring and recording Pretrial Detainees using the toilets in the Holding Cells constitutes an unreasonable search, in violation of the Fourth and Fourteenth Amendments to the United States Constitution (and, by extension, Section 1983), and an intrusion upon seclusion. (A.8).

On September 13, 2018, Judge Ronald A. Guzman ("Judge Guzman")—to whom this case was initially assigned—set a January 14, 2019 class discovery deadline and referred this matter to Magistrate Judge Maria Valdez ("Judge Valdez") for discovery purposes.[2]  (A.753, A.810).  Thereafter, this case proceeded to class-related discovery.

### A.   The Course of Class-Related Discovery.

Although, for brevity, Plaintiffs will not recount the long and convoluted procedural history of this case with respect to discovery, they will highlight some of the salient points relevant to the instant appeal. In short, during the course of

---

[2] The class certification discovery deadline was later extended to February 13, 2019, on Defendants' motion (A.753).

discovery, Defendants repeatedly failed to properly respond to Plaintiffs' written discovery requests, provide Plaintiffs with the initial disclosures required by Rule 26(a), canceled scheduled depositions, and/or failed to produce competent witnesses as required by Rule 30(b)(6).  (A.753).

Defendants' failure to fulfill their discovery obligations resulted in Plaintiffs filing two motions to compel in early 2019, and multiple Status Hearings before Judge Valdez.  (A.332-809). Although, during those Status Hearings, Judge Valdez granted both motions in part, and set firm dates by which Defendants were required to respond to discovery, Defendants failed to comply with Judge Valdez's orders.  (A.338).

Defendants' discovery delays also necessitated an emergency motion to extend the District Court's February 13, 2019 discovery deadline to March 15, 2019, which was granted by Judge Guzman on February 12, 2019. (A.752-759).

In light of that new discovery deadline, on March 5, 2019, Judge Valdez set a deposition schedule, ordering that the depositions of two of the Plaintiffs were to be taken the following week on Monday and Tuesday in the evenings, and that the depositions of the Rule 30(b)(6) witnesses should be taken the following Wednesday, March 13, 2019. (A.340) Judge Valdez further ordered that "[a]ll supplemental responses to discovery, as discussed in open court, must be completed by March 8, 2019." (A.529).

As ordered by Judge Valdez, the depositions of two of the Plaintiffs took place on March 11, 2019 and March 12, 2019. (A.340). Although, on Wednesday, March 13,

2019, Plaintiffs were scheduled to take the depositions of three of Defendants' Rule 30(b)(6) witnesses, Defendants failed to produce a witness who was adequately prepared to testify regarding the subjects specified in the applicable deposition notice. (A.499-525).   This—in conjunction with the fact that Defendants failed to produce all required written discovery responses by Judge Valdez's March 8, 2019 deadline (A.695)—led the parties to agree, on the record, that they would complete these depositions after the March 15, 2019 deadline. (A.340-341).

In sum, as of March 15, 2019—which was the class discovery deadline—three depositions (two of the Plaintiffs and one of a Deputy Sheriff subpoenaed by Plaintiffs) were taken.  Thus, by the class discovery deadline, Defendants were able to take all of the Plaintiffs' depositions, but Plaintiffs were not able to take all of the depositions of Defendants' Rule 30(b)(6) witnesses.

**B.    The Close of Class-Related Discovery.**

After the close of discovery, Plaintiffs tried to schedule the depositions of Defendants' remaining Rule 30(b)(6) witnesses pursuant to the parties' agreement. However, counsel for Defendants reneged on the agreement and refused to produce the witnesses. (A.341-42).

In light of Defendants' continued failure to fulfill their discovery obligations and noncompliance with Judge Valdez's orders, and their decision to renege on their agreement with Plaintiffs, Plaintiffs filed a third motion to compel, a motion for sanctions regarding the inadequacy of Defendants' designated witnesses at the scheduled depositions, a motion to take additional Rule 30(b)(6) depositions after District Court's discovery deadline, and a fee petition seeking to recover the

attorneys' fees incurred in connection with their first two motions to compel (which were, in large part, granted). (A.330-750). Judge Guzman, however, summarily denied all of these motions on the grounds that they were untimely, without a hearing or any other consideration thereof. (A.330-331). As a result, Plaintiffs were unable to conduct any additional discovery beyond what they had obtained as of March 15, 2019.

### C.    Briefing on Plaintiffs' Motions for Class Certification.

After the close of class related discovery, Plaintiffs filed a motion for class certification, pursuant to Fed. R. Civ. P. 23. (A.325). After that motion was fully briefed, Judge Guzman ordered additional briefing regarding the identification of, and providing notice to, putative class members, as well as the possibility of bifurcation and issue certification. (A.325-329). The parties then provided the District Court with supplemental briefing on those issues. (A.324).

On October 21, 2019, Judge Guzman issued an order holding that summary judgment should be resolved prior to class certification, and instructing the parties to file statements, within 14 days, "setting forth the issues they believe are properly resolved at this stage and the manner in which they propose doing so." (A.324). In response to that October 21, 2019 order, Plaintiffs filed a position statement arguing that that case cannot be resolved on summary judgment, but noting that, if Defendants moved for summary judgment, Plaintiffs would require further merits discovery relative to their individual claims. (A.317-323).

Then, on November 20, 2019, Judge Guzman issued an order denying Plaintiffs' pending motion for class certification on the grounds that the class defined therein

was overbroad because, under controlling Seventh Circuit precedent at the time, Prehearing Arrestees and Pretrial Detainees—who were both included in the putative class definition—had different Fourth Amendment rights. (A.314-316). Nevertheless, Judge Guzman granted Plaintiffs leave to refile a new motion for class certification with a more limited class definition by December 13, 2019. (*Id.*).

Plaintiffs subsequently filed a second motion for class certification on December 13, 2019. (A.85-313). In lieu of responding to that motion, Defendants requested that the issue of summary judgment be resolved before the issue of class certification, as permitted by Judge Guzman's November 20, 2019 order. (A.83-84). As a result, on January 29, 2020, Judge Guzman ordered the parties to brief the issue summary judgment, and struck Plaintiffs' second motion for class certification without prejudice (*Id*.).

Notably, despite the fact that, in response to Judge Guzman's October 21, 2019 order, Plaintiffs stated that they would require further merits discovery relative to their individual claims if the case proceeded to briefing on summary judgment, Judge Guzman did not order any additional discovery to be completed. (A.83-84, A.321-322). Accordingly, Plaintiffs were required to respond to Defendants' motion for summary judgment without being able to conduct any additional discovery beyond the (incomplete) class certification-related discovery they had obtained as of March 15, 2019.

### D.     Briefing on Defendants' Motion for Summary Judgment.

On February 28, 2020, this case was reassigned to Judge John F. Kness, who presided over, and ruled on, Defendants' MSJ. (A.73-82). In granting Defendants'

MSJ with respect to Plaintiffs' Section 1983 claims, the District Court first concluded that "a live video feed, without any evidence of someone watching it, is insufficient to constitute a search" within the contemplation of the Fourth Amendment. (A.11-13). The District Court further held that, even if the live video recordings did, in fact, constitute a search, such a search was reasonable in light of the circumstances presented, including because Plaintiffs had no reasonable expectation of privacy in the Holding Cells. (A.13-17).

The District Court similarly concluded that Defendants' use of the Cameras did not constitute an invasion of privacy. (A.13-17). Again, the District Court's ruling was premised on its determination that Plaintiffs had no reasonable expectation of privacy in the Holding Cells. (A.13-17).

As set forth below, Defendants do not have any security or penological interest in monitoring or recording Pretrial Detainees using the toilets in the Holding Cells, as Pretrial Detainees are searched multiple times before being placed in a Holding Cell (A.94). In fact, in order to block the view of the Toilet Area, Defendants placed censor boxes over the Toilet Area in the video feeds of some cameras that monitor some of the Holding Cells, which demonstrates Defendants' acknowledgement that recording Pretrial Detainees using the toilet in Holding Cells is entirely unnecessary. (*Id.*). Therefore, Defendants' practice of using Cameras to monitor and record Pretrial Detainees, including their genitals, without completely obstructing the Toilet Areas of the Holding Cells is an unjustified invasion of privacy and a violation of their constitutional rights.

## SUMMARY OF THE ARGUMENT

The District Court erred in granting Defendants' MSJ with respect to Plaintiffs' Section 1983 and instruction upon seclusion claims. As set forth below, Plaintiffs had both a subjective and objectively reasonable expectation of privacy while using the toilets in the Holding Cells. Defendants' use of the Cameras while Plaintiffs used those toilets in the Holding Cells constituted a search within the contemplation of the Fourth Amendment.

In addition, this search was unreasonable, as Defendants lacked a legitimate security interest or any other reasonable justification for filming Plaintiffs while using those toilets in the Holding Cells. Therefore, the MSJ Order and Entry of Judgment in Defendants' favor should be reversed.

The District Court also erred in refusing to permit Plaintiffs to adequately complete discovery, and rejecting their attempts to secure Defendants' compliance with their discovery obligations. Accordingly, even to the extent that the MSJ Order and Entry of Judgment were properly entered, this matter should nevertheless be remanded to the District Court for consideration of outstanding issues related to discovery.

## APPELLATE STANDARD OF REVIEW

This Court reviews the District Court's grant of summary judgment *de novo*, viewing the record and all reasonable inferences drawn from the record in the light most favorable to Plaintiffs. *E.g.*, *Perdomo v. Browner*, 67 F.3d 140, 144 (7th Cir. 1995). However, with respect to the District Court's decisions regarding deadlines and discovery issues, this Court's standard of review is an abuse of discretion

standard. *See, e.g.*, *Mraovic v. Elgin, Joliet & E. Ry. Co.*, 897 F.2d 268, 270 (7th Cir. 1990); *McCarthy v. Option One Mortg. Corp.*, 362 F.3d 1008, 1012 (7th Cir. 2004).

**ARGUMENT**

**I.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT IN DEFENDANTS' FAVOR WITH RESPECT TO PLAINTIFFS' SECTION 1983 CLAIM.**

For purposes of Plaintiffs' Section 1983 claim, the Court must determine (1) whether Defendants' video recording of Pretrial Detainees using the toilets in the Holding Cells constituted a "search" within the contemplation of the Fourth Amendment, and (2) whether that search was reasonable. *E.g.*, *United States v. Correa*, 908 F.3d 208, 217 (7th Cir. 2018) ("The Fourth Amendment essentially asks two questions: first, has there been a search or a seizure, and second, was it reasonable.").[3] Here, for the reasons set forth *infra*, Defendants' conduct constituted an unreasonable search within the contemplation of the Fourth Amendment. Therefore, the District Court's holding to the contrary was incorrect, and should be reversed.

**A.    Plaintiffs Were Each Subject to a Search.**

"Under the Fourth Amendment, a 'search' occurs when 'the government violates a subjective expectation of privacy that society recognizes as reasonable.'" *E.g.*, *United States v. Caira*, 833 F.3d 803, 806 (7th Cir. 2016) (quoting *Kyllo v. United*

---

[3] As noted by the *Correa* court, these "steps are not always neatly divided" because "courts sometimes blend the question of reasonableness of law enforcement conduct with the question of whether the suspect had a reasonable expectation of privacy." *Correa*, 908 F.3d at 217. Such was the case in the proceedings below. Accordingly, in the discussion that follows, Plaintiffs will only focus on the portions of the District Court's decision that are relevant to each step, while deferring discussion of other portions thereof to later Sections.

*States*, 533 U.S. 27, 33 (2001)); *United States v. Scott*, 731 F.3d 659, 663 (7th Cir.

2013); *United States v. Tuggle*, 4 F.4th 505, 513 (7th Cir. 2021).  Here, as explained

below, Plaintiffs had a subjectively and objectively reasonable expectation of privacy

when using the toilets in the Holding Cells.

> ### 1.     The Recognition of a Reasonable Expectation to Privacy Within the Toilet Areas Is Consistent With This Court's Precedent.

Although few courts have specifically addressed the issue of pretrial detainees'

and prisoners' privacy rights when using the toilet, the ones to do so have held that

such a right exists.  *Wilkes v. Borough of Clayton*, 696 F. Supp. 144, 147-48 (D.N.J.

1988) (holding "that arrestees may reasonably expect to defecate, urinate, and

change sanitary napkins or tampons without direct visual observation by law

enforcement officers, unless some justification for the intrusion is demonstrated");

(cited with approval by *Carroll v. Vill. of Homewood*, 2001 WL 1467708, at *11

(N.D. Ill. 2001)); *DiLoreto v. Borough of Oaklyn*, 744 F. Supp. 610, 620 (D.N.J.

1990).  For the reasons set forth below, these holdings are consistent with this

Court's precedent, and therefore, this Court should recognize Pretrial Detainees'

right to bodily privacy when using the toilets in the Holding Cells.

First, as most recently made clear by this Court (sitting *en banc*) in *Henry*—

which applies to "pretrial detainees and convicted prisoners alike"—"the privacy

interest in one's body is clearly a heightened and fundamental one."  *Henry v.

Hulett*, 969 F.3d 769, 778-79 (7th Cir. 2020) (*en banc*).  Indeed, "one of the clearest

forms of degradation in Western Society is to strip a person of his clothes," such that

"the right to be free from strip searches and degrading body inspections is thus

basic to the concept of privacy." *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994); *Henry*, 969 F.3d at 778 (same); *see also*, *Mary Beth G. v. City of Chi.*, 723 F.2d 1263, 1272 (7th Cir. 1983) (noting that strip searches are "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, [and] signifying [of] degradation and submission"). For this reason, even prior to *Henry*, this Court repeatedly held that, although pretrial detainees' and prisoners' "rights may be *diminished* by the needs and exigencies of the institutional environment," they still retain a Fourth Amendment right to bodily privacy. *E.g.*, *Canedy*, 16 F.3d at 185-86 (emphasis added); *Sparks v. Stutler*, 71 F.3d 259, 261 (7th Cir. 1995); *Forbes v. Trigg*, 976 F.2d 308, 312 (7th Cir. 1992); *Peckham v. Wisconsin Dept. of Corr.*, 141 F.3d 694, 697 (7th Cir. 1998).

Although this case does not involve strip searches *per se*, several courts have noted the similarities between strip searches and the observation of an individual using the toilet. *Wilkes*, 696 F. Supp. at 147-49 ("The [defendants'] policy of watching arrestees use bathroom facilities [is] no less destructive of arrestees' rights than[] visual strip searches" because "the act itself, no less than a strip search, necessitates the exposure of the arrestee's genitalia to the observing officer."); *Capua v. City of Plainfield*, 643 F. Supp. 1507, 1514 (D.N.J. 1986) ("The requirement of surveillance during urine collection forces those tested to expose parts of their anatomy to the testing official in a manner akin to strip search exposure."); *DiLoreto*, 744 F. Supp. at 620-22 (characterizing the defendant's "visual observation of [the] plaintiff while urinating" as a "strip search"). In other words,

since, like a strip search, Plaintiffs were subjected to visual inspection of their anal and genital areas when they were recorded using the toilets in the Holding Cells, the same fundamental interest in bodily privacy that has been repeatedly recognized by this Court is implicated here. *See, e.g.*, *Canedy*, 16 F.3d at 185 (noting that "*all* forced observations or inspections of the naked body implicate a privacy concern") (emphasis added); *see also*, *Capua*, 643 F. Supp. at 1514 ("The interests of human dignity and privacy…are implicated with equally compelling force when individuals are directed to urinate in the presence of a government agent.") (quotations omitted).

Second, in *Henry*, this Court also recognized that, "while prison security requires officials to constantly monitor prisoners' cells, the same is not true of their unclothed persons." *Henry*, 969 F.3d at 778; *see also*, *Houchins v. KQED, Inc.*, 438 U.S. 1, 5, n. 2 (1978) ("Inmates in jails, prisons, or mental institutions retain certain fundamental rights of privacy; they are not like animals in a zoo to be filmed and photographed at will.") (plurality opinion of Burger, C.J.). This observation rings even more true with respect to the use of the toilet because, as explained in *Von Raab* (and repeated in *DiLoreto* and *Wilkes*):

> There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom.
>
> *Nat'l Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175 (5th Cir. 1987); *DiLoreto*, 744 F.Supp. at 620; *Wilkes*, 696 F. Supp. at 147.

Put another way, the conduct at issue in this case was, in anything, even *more* objectionable than the strip searches at issue in *Henry* because it involved observation one of the most private acts imaginable. *See, e.g.*, *Wilkes*, 696 F. Supp. at 147 ("One strains to conjure up an activity more private than the changing of a sanitary napkin[,] urination, or defecation."); *Capua*, 643 F. Supp. at 1514 ("While urine is routinely discharged from the body, it is generally discharged and disposed of under circumstances that warrant a legitimate expectation of privacy. The act itself…is traditionally private. Facilities both at home and in places of public accommodation recognize this privacy tradition."); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 658 (1995) ("Excretory function[s are] traditionally shielded by great privacy.") (quoting *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 626 (1989)).

Indeed, perhaps the only thing more demeaning than being forced to disrobe and stand naked while the government observes one's naked body is to be using the toilet while doing so. *See, e.g.*, *Wilkes*, 696 F. Supp. at 147 ("It may be the case that any women would prefer a visual strip search to the humiliation of being observed while changing a sanitary napkin or tampon."). Therefore, as with strip searches, "an inmate's expectation of bodily privacy" with respect to the use of the toilet "is the kind of expectation that society is prepared to recognize as reasonable," even in light of "the safety and security concerns inherent to the prison context." *Henry*, 969 F.3d at 778-79; *see also*, *Wilkes*, 696 F. Supp. at 147 ("It is indisputable that our society considers these tasks uniquely intimate and private.").

Third, in accordance with Supreme Court precedent, this Court has held that correctional facilities have a duty to provide for inmates' and pretrial detainees' "basic human needs" such as "food, clothing, shelter, medical care, and reasonable safety." *E.g.*, *Tesch v. Cnty. of Green Lake*, 157 F.3d 465, 472 (7th Cir. 1998) (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)); *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003). For the same reasons set forth above, "an activity as basic and private as urination should[] be included as a part of that framework," as "it would be unfathomable to suggest that courts should be unwilling to include the ability to urinate or defecate [in privacy] as a part of these basic needs." *West v. Dallas Police Dept.*, 1997 WL 452727, at *6 (N.D. Tex. 1997) (holding that "an individual's ability to urinate or defecate in reasonable privacy is clearly established as a right"); *see also*, *Canedy*, 16 F.3d at 185 ("The desire to shield one's unclothed figure from views of strangers…is impelled by elementary self-respect and personal dignity.") (quoting *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963)). Accordingly, this Court, in accordance with its own precedent, should make clear that Pretrial Detainees have a reasonable expectation of privacy when using the toilets in the Holding Cells.

Finally, this Court has, historically, recognized that, prior to being afforded a probable cause hearing, pretrial detainees—*i.e.*, Prehearing Arrestees—have heighted rights to privacy. *Ortiz v. City of Chicago*, 656 F.3d 523, 538 (7th Cir. 2011); *Flores v. Lackage*, 938 F.Supp.2d 759, 775 (N.D. Ill. 2013) (citing *Lopez v. City of Chicago,* 464 F.3d 711, 719 (7th Cir. 2006), and *Williams v. Rodriguez*, 509

F.3d 392, 403 (7th Cir. 2007)); *Currie v. Chhabra*, 728 F.3d 626, 631 (7th Cir. 2013).

Here, Plaintiffs were all Prehearing Arrestees at the time they were recorded.

(A.100.  Although, in the wake of *Henry*, it is unclear if such a distinction continues

to exist, to the extent that it does, it further supports the notion that Plaintiffs had

a reasonable expectation of privacy when using the toilets in the Holding Cells.

> ### 2.    The Rationale Employed by the District Court With Respect to Plaintiffs' Reasonable Expectation of Privacy Was Manifestly Erroneous.

Despite acknowledging this Court's prior holdings with respect to Pretrial

Detainees' right to bodily privacy, the District Court nevertheless ruled that

Plaintiffs lacked a reasonable expectation of privacy when using the toilets in the

Holding Cells.  (A.15.  In essence, according to the District Court, because "pretrial

detainees placed in a jail cell in which they acknowledge cameras are present" are

put "on notice that they may be watched," they have no expectation of privacy

whatsoever.  (Id.). As set forth below, however, the District Court's reasoning on

this point was fundamentally flawed and contravenes Seventh Circuit precedent.

First, while it is true that, under the Supreme Court's decision in *Hudson*,

"prisoners are entitled 'to no reasonable expectation of privacy in their *prison cells*,"

*Hudson* is wholly inapplicable here.  (A.10-11 (quoting *Henry*, 969 F.3d at 782 (in

turn quoting *Canedy*, 16 F.3d at 185 (in turn citing *Hudson v. Palmer,* 468 U.S. 517,

526 (1984)))) (emphasis added by District Court)).  As just explained, this Court has

repeatedly recognized the distinction between the "right to privacy in one's body"

and the "right to privacy in one's property and surroundings" within the confines of

a correctional institution, and has refused to extend *Hudson* to circumstances where

prisoners' and pretrial detainees' right to bodily privacy is implicated. *E.g.*, *Henry*, 969 F.3d at 779; *Canedy*, 16 F.3d at 185-86; *Sparks*, 71 F.3d at 261 ("Certainly *Hudson* does not establish that the interior of one's body is as open to invasion as the interior of one's cell."); *Forbes*, 976 F.2d at 312 ("Prison inmates retain protected privacy rights in their bodies, although these rights do not extend to their surroundings.").

Such was the case even in *Canedy*—which, according to the District Court, was "carefully preserved" by this Court's opinion in *Henry* and warranted its ruling against Plaintiffs. (A.10-11). As explained in *Henry*, the *Canedy* court's citation to *Hudson* was merely for the proposition that "*some* diminution of privacy is…to be expected in prison," and that prisoners "do not enjoy the full sweep of constitutional rights afforded other members of society." *Henry*, 969 F.3d at 782 (quoting *Canedy*, 16 F.3d at 185) (emphasis added). "But, even so," the *Canedy* court went on to note that "those who are convicted of criminal offenses do not surrender all of their constitutional rights," and ultimately held that the plaintiff did, in fact, have a constitutionally-protected right to bodily privacy, notwithstanding *Hudson*. *Canedy*, 16 F.3d at 185-86. Therefore, the District Court's selective reading of *Henry* and *Canedy* was simply wrong.

Second, the District Court's reliance on *Hudson* was part of a larger pattern of outright ignoring Plaintiffs' expectation of *bodily privacy*, and instead focusing on whether they had a reasonable expectation of privacy in the Holding Cells *at large*. (A.14). For example, in the proceedings below, the District Court analogized

Plaintiffs' expectation of privacy to the one discussed in *Paxton*, wherein this Court held that the defendants had no expectation of privacy in a conversation held within a police van because, "as detainees, they could not reasonably have perceived the (marked) police van as a sanctuary for private conversation." *United States v. Paxton*, 848 F.3d 803, 811 (7th Cir. 2017).

This analogy not only contravenes *Henry* and the other cases cited above—which make clear that Pretrial Detainees retain a reasonable expectation of bodily privacy even within the confines of correctional institutions—but is, frankly, insulting, given the significant differences between the subject matter involved.  As set forth *supra*, the use of a toilet is recognized by society as an inherently *personal* activity, and is one of "the most intimate of personal hygienic tasks" which "many do not choose to reveal [even] to the most intimate of their family and friends."  *E.g.*, *Wilkes*, 696 F. Supp. at 147; *Von Raab*, 816 F.2d at 175; *DiLoreto*, 744 F.Supp. at 620; *Capua*, 643 F. Supp. at 1514.  In contrast, even the most private of conversations are shared with at least one other individual, and—unlike the use of a toilet, which is a *categorically* private activity—may or may not carry an expectation of privacy, depending on the circumstances under which the conversations are held. *See, e.g.*, *United States v. Scott*, 731 F.3d 659, 664 (7th Cir. 2013) (discussing the disparate outcomes in *Katz v. United States*, 389 U.S. 347, 351 (1967) and *United States v. McLeod*, 493 F.2d 1186, 1188 (7th Cir. 1974)).

Moreover, in *Paxton*, the court's holding that the defendants lacked a reasonable expectation of privacy even though their "surroundings may have lulled them into

assuming, mistakenly, that their discussions could not be overheard," was based on its observation that the police van's "metal dividing walls, with their thick plexiglass windows, were present to serve a security function rather than to foster an atmosphere of solitude and privacy." *Paxton*, 848 F.3d at 811. But here, the partitions surrounding each Holding Cell's Toilet Area do not serve any security function; their sole purpose is to shield Pretrial Detainees from the views of others when they are using the toilets therein. (A.37, A.42-43). As such, unlike *Paxton*—where the detainees "could not reasonably have perceived the (marked) police van as a sanctuary for private conversation"—Plaintiffs could, and did, reasonably perceive the Holding Cell's shielded Toilet Area as a private place in which they could use the toilet without observation. *See*, *Paxton*, 848 F.3d at 811; *Katz*, 389 U.S. at 353 (holding that an individual "justifiably relied" on the seclusion of a closed phone booth because its purpose was to shield his conversation from "the uninvited ear").

Furthermore, even if Plaintiffs knew that they were being watched in a general sense, it does not necessarily follow that they knew they were being watched in a way that would violate the expectation of bodily privacy—*i.e.*, that they would be recorded when using the toilets in the Holding Cells. For example, in *Katz*, although the government argued that an individual had no expectation of privacy while using an enclosed glass phone booth because "he was as visible after he entered it as he would have been if he had remained outside," the Supreme Court rejected this argument, holding that "what he sought to exclude when he entered

the booth was not the intruding eye—it was the uninvited ear." *Katz*, 389 U.S. at 352.  In other words, even in a location where an individual may lack an expectation of privacy in one thing—*e.g.*, being seen using a phone booth—he can still retain a reasonable expectation of privacy in another—*e.g.*, a conversation. *Katz*, 389 U.S. at 352; *see also*, *Henry*, 969 F.3d at 779 (acknowledging the "right to privacy in one's body" even within the confines of a correctional institution).

Here, for the same reasons already stated, it was simply (and reasonably) unfathomable to Plaintiffs that Defendants would have any need to record them while using the toilets in the Holding Cells.  *Henry*, 969 F.3d at 778 ("While prison security requires officials to constantly monitor prisoners' cells, the same is not true of their unclothed persons."). Plaintiffs' understanding on this point was also bolstered by the fact that each Holding Cell's Toilet Area was shielded from the views of others. (A.37, A.43).  Therefore, Plaintiffs retained a reasonable expectation of bodily privacy, notwithstanding the fact that they were located within the Holding Cells when using the toilets therein. *Wilkes*, 696 F. Supp. at 147-48; *see also*, *Henry*, 969 F.3d at 779.

Finally, "as the Supreme Court has noted, 'the Fourth Amendment protects people, not places.'" *Scott*, 731 F.3d at 664 (quoting *Katz*, 389 U.S. at 351). Accordingly, "the overarching focus of the Fourth Amendment reasonableness analysis" is "an individual's expectation of privacy 'in *what was searched*,'" as opposed to *where* a search occurred. *See, e.g.*, *Henry*, 969 F.3d at 783 (quoting *Scott*, 731 F.3d at 664) (emphasis added by *Henry*); *Katz*, 389 U.S. at 351.

Based on these principles—and this Court's observation that, when bodily privacy is implicated, "what was searched" is the human body—the District Court's analysis of Plaintiffs' claims *should* have been primarily focused on their reasonable expectation of *bodily privacy*, and not *where* they were located when that search occurred. *See, e.g.*, *Henry*, 969 F.3d at 783 (emphasis omitted); *Katz*, 389 U.S. at 351. Any holding to the contrary would directly contravene *Henry* (and the other cases cited above), as it would mean that, so long as a search occurred within the confines of a correctional institution, a reasonable expectation of privacy can *never* exist. *E.g.*, *Henry*, 969 F.3d at 779 (acknowledging the "right to privacy in one's body" even within the confines of a correctional institution). As such, the District Court's myopic focus on the fact Plaintiffs were located in the Holding Cells was in error.

### 3.   The Fact That Plaintiffs Were Recorded With Cameras Does Not Invalidate Their Claims.

Although, in the proceedings below, the District Court did not fully resolve the issue, it expressed doubt that being recorded by the Cameras—as opposed to being observed using the Holding Cells' toilets in person—could constitute a search within the contemplation of the Fourth Amendment. (A.13). But, for the reasons set forth *infra*, there is no reason to draw such a distinction in this case.

First, is well-settled that an invasion of privacy "does not require that anyone listen or hear the recordation" because even the "*potential* disclosure" of an improperly-recorded private moment "impairs the mental peace and comfort associated with an individual's expectation of privacy." *Amati v. City of Woodstock,*

*Ill.*, 829 F.Supp. 998, 1010 (N.D. Ill. 1993) (collecting cases nationwide and citing Restatement (Second) of Torts § 625B, 379, illustration 3 (1977)) (emphasis added). Indeed, "one's seclusion may be as much disrupted by the presence of an electronic ear in a setting where one would normally expect to be alone as it is by the presence of a human ear in that same place." *Amati*, 829 F.Supp. at 1010.

Second, being recorded in a state of undress (or while using the toilet) is, at the very least, just as "demeaning [and] embarrassing" as being viewed in that state while in person, if not more so because the video can be viewed many times by different people. *See, e.g.*, *Henry*, 969 F.3d at 778 (quoting *Mary Beth G.*, 723 F.2d at 1272); *Wilkes*, 696 F. Supp. at 148-49 (holding that a detainee who was subject to observation while "chang[ing] her sanitary napkin" suffered a "significant intrusion on her privacy—one likely to engender shame and humiliation"). Therefore, the same justifications underlying this Court's recognition of prisoners' and Pretrial Detainees' right to bodily privacy with respect to visual inspections are equally applicable when an individual is recorded using a camera. *See, e.g.*, *Henry*, 969 F.3d at 778; *Houchins*, 438 U.S. at 5, n. 2 (noting the prisoners' "fundamental rights of privacy" protects them from being "filmed and photographed at will").

Third, consistent with the foregoing, in *Arnzen*, the Eighth Circuit held that "capturing images," in itself, violates individuals held in custody's "reasonable expectation of privacy . . . irrespective of whether there is some chance that those images will not be viewed." *Arnzen v. Palmer*, 713 F.3d 369, 372-73 (8th Cir. 2013). Although, in the proceedings below, the District Court attempted to distinguish

*Arnzen* on the grounds that the "single-person bathrooms" at issue in that case "are inherently different from" the Holding Cells at issue here, this distinction, if it even exists, has no bearing on the *Arnzen* court's holding that video recording can constitute a "search" within the contemplation of the Fourth Amendment. *Arnzen*, 713 F.3d at 373. Indeed, even assuming, *arguendo*, that there are material differences between single-person bathrooms and the Holding Cells at issue in this case—which, as explained below, there are not—such differences are only relevant to the issue of whether a reasonable expectation of privacy existed, and *not* whether a video recording can constitute a search. *See*, *Arnzen*, 713 F.3d at 372-73.

Regardless, when it comes to the issues in this case, single-person bathrooms are *not* materially different from the Holding Cells. For one, the Toilet Areas in the Holding Cell, like the single-person bathrooms at issue in *Arnzen*—but, unlike typical prison cells, which frequently contain toilets open to visual inspection by guards and other inmates—are in fact, shielded from the view of others and designed to keep Pretrial Detainees' use thereof private. (A.43). For another, as set forth in Section I-A-2, *supra*, the privacy right at issue in this case pertains to *bodily privacy*, which continues to exist regardless of the setting in which a detainee is held. *See, e.g.*, *Henry*, 969 F.3d at 779. Finally, given this Court's recognition that prison guards have no need to "constantly monitor prisoners'…unclothed persons" (*Henry*, 969 F.3d at 778), it can hardly be said that Defendants' interest in monitoring Pretrial Detainees—who have already been searched multiple times prior to being placed in the Holding Cells—while using the toilet was any greater

than the *Arnzen* defendants' interest in monitoring involuntarily committed individuals deemed to be "sexually violent predators." *Arnzen*, 713 F.3d at 371, 373 (noting that there was no need to record detainees "when there [was] no immediate indication that it is being used for purposes other than those ordinarily associated with bathroom facilities").

Fourth, the District Court's reliance on *Tuggle*—wherein the court held that the use of cameras to record "ground-level video footage of an unobstructed home from a public vantage point is not a search"—is equally unavailing on this point. *Tuggle*, 4 F.4th at 516. Most significantly, the *Tuggle* defendant "did not have a[ reasonable] expectation of privacy" because the recordings at issue were of "the outside of [the defendant's] house and his driveway," which "were plainly visible to the public," whereas this case involves the recording of the most private and personal of occurrences. *Compare*, *Tuggle*, 4 F.4th at 514 *with* Section I-A-1, *supra.* Similarly, although, as noted in *Tuggle*, video cameras are in "general public use" (*Tuggle*, 4 F.4th at 516 (quoting *Kyllo*, 533 U.S. at 40), it is highly socially unacceptable, and, in fact, illegal to use video cameras to record others while using the toilet and/or in a state of undress (*See, e.g.*, 720 ILCS 5/26-4(a); *Capua*, 643 F. Supp. at 1514 (Bathroom "facilities both at home and in places of public accommodation recognize this privacy tradition."); *Gustafson v. Adkins*, 803 F.3d 883, 889 (7th Cir. 2015) (describing "the installation of covert surveillance equipment in a changing area" as "criminal and outrageous" in the context of a Fourth Amendment claim)).

Moreover, unlike *Tuggle*—where the video cameras at issue did not provide the government with significantly "more detailed information than" could have been "observed without a camera," "penetrate walls or windows so as to hear and record confidential" information, or "explore details of the home that would previously have been unknowable without physical intrusion" (*Tuggle*, 4 F.4th at 516 (quotations and citations omitted))—the Cameras in the Holding Cell were placed at a vantage point that allowed them to record something—*i.e.*, Pretrial Detainees' use of the toilet—that was otherwise *unable* to be seen by other Pretrial Detainees and guards, absent a physical intrusion into the Toilet Area (A.26). In fact, the *Tuggle* court explicitly distinguished the facts present in that case from "the more challenging situation in which the government intentionally places cameras to see *over* a fence to observe a private residence in a manner unavailable to a ground-level passerby." *Tuggle*, 4 F.4th at 513 (emphasis in original). Therefore, the holding in *Tuggle* is entirely inapplicable here.

Finally, for the same reasons discussed above, the fact that, at least according to the District Court, "there is no evidence that any member of the Sheriff's department (or anyone else) watched the video feeds while any Plaintiff used the toilet" is irrelevant; what matters is that they were *recorded* while doing so. *Amati*, 829 F.Supp. at 1010; *Arnzen*, 713 F.3d at 372-73. Moreover, tt is certainly reasonable to infer that, given the grave security concerns Defendants claim justify their use of the Cameras to record the Toilet Areas, *someone* watched the video

26

feeds while Plaintiffs used the toilets therein, as is the standard for purposes of summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Nevertheless, it is important to note that, as more fully explained in Section III, *infra*, the primary reason why certain evidence is lacking in the record is that the District Court denied Plaintiffs a reasonable opportunity to complete discovery. Therefore, to the extent that these evidentiary issues bear on this Court's decision, it should reverse and remand this matter for the completion of discovery.

### 4. Plaintiffs Had a Subjective Expectation of Privacy.

For many of the same reasons set forth above, Plaintiffs also had a subjective expectation of bodily privacy when using the toilets in the Holding Cells. First, given that the Toilet Areas of the Holding Cells in which they were placed were private and shielded from the views of others, Plaintiffs subjectively believed that they were not being monitored and recorded while using the toilet. (A.37). While it is true that Plaintiffs were aware of the *presence* of the Cameras in the Holding Cells, they could not see where those Cameras were directed. (*Id.*). Regardless, Plaintiffs reasonably assumed that the Cameras were *not* aimed at the Toilet Area of the Holding Cells, or, even if they were, would not be able to record them using the toilets because each Holding Cell's Toilet Area is partitioned to block the view from outside the cell and from inside the rest of the cell.[4] (A.26). Therefore,

---

[4] Notably, the existence of a fence or other type of partition shielding an area from public view can indicate the presence of a subjective expectation of privacy. *See*, *Tuggle*, 4 F.4th at 513-14 (citing *United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987)).

Plaintiffs had a subjective expectation of privacy when using the toilets in the Holding Cells.

### B.     The Searches at Issue Were Unreasonable.

Since Defendants' recording of Plaintiffs while using the toilets in the Holding Cells constituted a search, the next issue is whether that search was reasonable in light of "the scope of the particular intrusion, the manner in which it [was] conducted, the justification for initiating it, and the place in which it [was] conducted." *E.g.*, *Henry*, 969 F.3d at 784 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).  Although, in evaluating reasonableness, prison administrators are entitled to a degree of deference, a court need not defer to policies that are "unnecessary or unjustified responses to problems of jail security." *E.g.*, *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 323 (2012).  Here, as explained below, Defendants' recording of Plaintiffs was unreasonable, notwithstanding the District Court's holding to the contrary.

### 1.     The Scope of the Intrusion Was Significant.

For the reasons set forth in Section I-A-1, *supra*, the type of search at issue in this case was as demeaning and invasive as a search could be.  *E.g.*, *Mary Beth G.*, 723 F.2d at 1272; *Henry*, 969 F.3d at 778 (quoting *Canedy*, 16 F.3d at 185); *Wilkes*, 696 F. Supp. at 147-49 ("We have little doubt that arrestees forced to defecate and urinate while being viewed by[] police suffer a serious invasion of privacy.  Few acts could be more personal; fewer still would one desire a stranger to watch.").  Therefore, "the nature of the acts observed is such as to render the scope of the intrusion [at issue in this case] significant," which weighs against a finding of

28

reasonableness. *Wilkes*, 696 F. Supp. at 149; *Calvin v. Sheriff of Will Cnty.*, 405 F.Supp.2d 933, 938 (N.D. Ill. 2005) ("Courts have repeatedly held that strip searches that include visual inspection of the anal and genital areas are inherently invasive.").

### 2.    The Manner of the Intrusion Was Unreasonable.

The manner of the intrusion at issue in this case also weighs against a finding of reasonableness.  First, "it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex." *Canedy*, 16 F.3d at 185. For this reason, in *Wilkes*—despite ultimately finding that the observation of arrestees while using the restroom constituted an unreasonable search—the court noted that the defendants' "attempt[] to carry out its policy in the least intrusive manner possible by allowing arrestees to use a small, remote bathroom observed only by officers of the same sex" weighed in favor of a finding of reasonableness. *Wilkes*, 696 F. Supp. at 149.

Here, however, both male and female Sheriff's deputies in the control rooms where the Camera feeds are displayed are able view Pretrial Detainees using the toilets in the Holding Cells in real time.  (A.26).  In addition, these recordings can be accessed by Sheriff's deputies (and other employees), irrespective of gender, anywhere in Cook County.  (A.26).  Therefore, the manner of the intrusion at issue in this case is even more objectionable than the intrusion at issue in *Wilkes*.  *Wilkes*, 696 F. Supp. at 149.

Second, as set forth in Section I-A-3, *supra*, it makes no difference that Plaintiffs were observed using the toilets in the Holding Cells by Cameras, as opposed to in

person.  Indeed, being recorded while using a toilet is, at the very least, just as demeaning and humiliating as being observed in person.  *See, e.g.*, *Amati*, 829 F.Supp. at 1010.

Third, under the circumstances present in this case, the fact that Plaintiffs were recorded using Cameras is actually *more* objectionable than being observed in person. As noted above, "the desire to shield one's unclothed figure from views of strangers…is impelled by elementary self-respect and personal dignity." *Canedy*, 16 F.3d at 185 (quoting *York*, 324 F.2d at 455).   For this reason, had the Holding Cells been monitored in person by a guard, Plaintiffs could (and would) have, *inter alia*, (1) made a decision to use the toilet based on whether they could be seen from the guard's vantage point, (2) ascertained the angle from which they were being observed and then taken steps to properly shield themselves from observation, or even (3) asked the guard to divert his gaze from the Toilet Area while they used it.

But, here, since the Holding Cells (and the Toilet Areas therein) are surreptitiously monitored by Cameras, Plaintiffs were each subject to a highly invasive and objectionable search without even knowing it was occurring, and, as previously explained, had no reason to even expect this was occurring.  *See*, Section I-A-2, *supra* (explaining why it was unfathomable to Plaintiffs that they would be recorded while using the toilets in the Holding Cells).  Indeed, the Cameras were enclosed in a "dome" that made it impossible for Plaintiffs to determine precisely where they were pointed, and neither Defendants, nor any signage within the Holding Cells, provided Plaintiffs with notification that the Cameras are aimed at

and view the Toilet Areas in the Holding Cells, or that they would be viewed and recorded by the Camera while using the toilets therein.  (A.26, A.125 (43:7-11)).

In other words, due to Defendants' surreptitious use of Cameras, Plaintiffs had no opportunity to properly shield themselves from observation. Therefore, Defendants' use of Cameras renders the manner of the searches at issue in this case even more unreasonable.

Finally, although the fact that a search may "have been accomplished by less intrusive means does not, by itself, render the search unreasonable," it is nevertheless a relevant consideration with respect to reasonableness. *See, e.g.*, *United States v. Tilmon*, 19 F.3d 1221, 1225 (7th Cir. 1994); *Arnzen*, 713 F.3d at 374. Here, as more fully explained *infra*, Defendants' own conduct of obscuring the Toilet Area in the video feeds of other Holding Cells indicates that being able to view the remainder of a given Holding Cell—without needing to record the Toilet Area—is reasonable to accomplish their security goals.  (A.41).  Therefore, the searches at issue in this case were unreasonable in light of the manner in which they were conducted.

### 3.    Defendants Lacked Justification for the Searches.

In the proceedings below, the District Court held that, "even if Plaintiffs had an expectation of privacy," the County and its Sheriff had "legitimate reasons, wholly consistent with the public interest, for monitoring individuals he has taken into his custody, that justify the intrusion." (A.15 (alterations and quotations omitted)). However, as was the case with respect to Plaintiffs' expectation of privacy, the District Court's analysis on this point was myopically focused on Defendants'

interest in monitoring the Holding Cells generally, as opposed to their interest in recording Pretrial Detainees using the toilets therein.  This was in error.

First, while Defendants' overarching interest in prison security may justify the use of video recording generally, it does not necessarily justify their use of the Cameras to record Pretrial Detainees while using the toilets in the Holding Cells. *E.g.*, *Henry*, 969 F.3d at 778 ("While prison security requires officials to constantly monitor prisoners' cells, the same is not true of their unclothed persons."). Indeed, for purposes of the reasonableness analysis, a court must consider "the governmental interest in conducting the *particular* searches in question," as opposed to the interest in security more generally.  *E.g.*, *Mary Beth G.*, 723 F.2d at 1272 (citing *Bell*, 441 U.S. at 559) (emphasis in original).

Ordinarily, for a particular search to be reasonable, there must be "antecedent justification" for the search.  *E.g.*, *Katz*, 389 U.S. at 359.  For this reason, "strip search cases have universally demonstrated that one element must be present for a strip search to be held reasonable: Police officers must have some level of *particularized* justification to strip search an individual arrestee." *Doe v. Calumet City, Ill.*, 754 F. Supp. 1211, 1220 (N.D. Ill. 1990) (emphasis added).  Accordingly, courts within this Circuit have repeatedly invalidated blanket strip search policies that result in the performance of searches in the absence of individualized reasonable suspicion, notwithstanding the existence of generalized prison security concerns.  *E.g.*, *Mary Beth G.*, 723 F.2d at 1272-73; *Young v. Cnty. of Cook*, 616 F.Supp.2d 834, 846 (N.D. Ill. 2009); *Doe*, 754 F. Supp. at 1220-21; *Calvin*, 405

F.Supp.2d at 938-45; *Tinetti v. Wittke*, 479 F. Supp. 486, 490 (E.D. Wis. 1979) (*aff'd,* 620 F.2d 160 (7th Cir. 1980)); *see also*, *Wilkes*, 696 F. Supp. at 150 ("In the strip search cases, the courts have rejected the notion that a blanket policy was a 'reasonable' way to further the government's legitimate desire to keep contraband and weapons out of its detention facilities.").

Here, Defendants' practice of recording Pretrial Detainees while they use the toilets in the Holding Cells is akin to a blanket strip search policy, as the only factor that makes a particular Pretrial Detainee subjected thereto is a desire to use the toilet, instead of any existence of reasonable suspicion by Defendants.  Therefore, as was the case in *Wilkes*, the Court should hold that "the Fourth Amendment forbids [Defendants] from visually observing [Pretrial Detainees] using bathroom facilities unless the[y] have a reasonable suspicion that" doing so with respect to a particular Pretrial Detainees is necessary.  *Wilkes*, 696 F. Supp. at 150.

Second, even assuming, *arguendo*, that the existence of a compelling security rationale can justify such a blanket policy, no such rationale is present here. Specifically, in the proceedings below, Plaintiffs pointed to the testimony of Deputy Sheriff Patrick Hecker ("Hecker"), who "testified that he was not aware of a valid security reason to monitor [Pretrial] Detainees while on the toilet, [and] that he was unaware of any weapon or contraband used by someone on the toilet in a Holding Cell."  (A.16). However, the District Court completely disregarded Hecker's testimony because he has "no policy-making authority."  (A.16).

Although the District Court justified its decision to ignore Hecker's testimony on the grounds that it only needed to give "deference to the professional judgment of *prison administrators*" (A.16 (emphasis in original)), there is a difference between giving deference versus uncritically accepting everything prison administrators say as unequivocally true (*See, e.g.*, *Young*, 616 F.Supp.2d at 847 ("Even though this Court must defer to [the defendants'] expertise, [they] are still obliged to present evidence in support of their blanket strip search policy.")). Indeed, since whether a search was reasonable is ultimately a question for a jury (*E.g.*, *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009)), courts routinely require prison administrators to come forth with evidence that actually supports their assertion that a particular practice is necessary for safety and security. *See, e.g.*, *Young*, 616 F.Supp.2d at 847-48 (evaluating specific evidence purportedly establishing that "security concerns…necessitate[d a] blank strip search policy" before concluding that "there [was] no basis upon which a jury reasonably could find that security concerns justify conducting [those] extremely invasive searches").

Here, other than vaguely referencing Defendants' interest in security and the deference accorded to prison administrators, the District Court did not identify a single specific reason as to why it was essential to record Pretrial Detainees while using the Holding Cells' toilets. (A.16-17). In fact, Defendants' own policies make clear that their invasive recording of Pretrial Detainees is entirely *unnecessary*. For example, when detainees arrive at the courthouses where the Holding Cells are located, they are subject to "regular" searches—*i.e.*, not strip searches—evidencing

that Defendants do not believe there is a need to observe Pretrial Detainees' genitals, absent justification to do so. (A.40).

Defendants' policies also prohibit "view[ing] an individual's private underclothing, buttock's, genitalia, or female breasts while that individual is showering, performing bodily functions or changing clothes, unless he/she otherwise qualifies for a strip search." (A.40-41). However, under Defendants' strip search policy, a strip search is only justified by reasonable suspicion based upon specific and articulable facts, and must be conducted by an officer of the same sex. (A.40-41). In other words, Defendants' own policies make clear that, in the absence of a specific basis to perform a strip search, there is no need to view a Pretrial Detainee's genitals.

Furthermore, if it was necessary to view Pretrial Detainees while using the toilet, then *all* of Defendants' Cameras should have an unobstructed view of the Holding Cells' Toilet Areas. Yet, this is true for only *some* of Defendants' cameras. (A.41). In fact, even where a Camera has an unobstructed view of a particular Holding Cell's Toilet Area, Defendants' video monitors, in some instances, display a black box over the Toilet Area, or Defendants' employees place an item over the monitor so as not to capture the Toilet Area. (A.41). Similarly, according to Defendants, they do not continuously monitor the Camera feeds, and only do so "as needed." (A.41).

Simply put, if Defendants' interest in security was so compelling that it necessitated monitoring Pretrial Detainees in the most personal of moments, then

*every* Camera should be capable of doing so and *constantly* monitored. The fact that neither thing is true belies any assertion that recording Pretrial Detainees while using the toilets in the Holding Cells is essential to safety and security, and shows that, even in the judgment of Defendants' prison administrators, these searches are entirely unnecessary. *Fonder v. Sheriff of Kankakee Cnty.*, 823 F.3d 1144, 1146-47 (7th Cir. 2016) (noting that varying and selective enforcement of a strip search policy undermined the argument that it was necessary for security). Therefore, as was the case in *Mary Beth G.*, "while the need to assure jail security is a legitimate and substantial concern," the blanket recording of Pretrial Detainees while they use the toilets bears "an insubstantial relationship to security needs so that, when balanced against [Pretrial Detainees'] privacy interests, the searches cannot be considered reasonable." *Mary Beth G.*, 723 F.2d at 1272-73 (holding that a blanket policy of strip searching women "even when there was no reason to believe they were hiding weapons or contraband on their persons" was unreasonable) (quotations omitted).

Third, in reaching its decision, the District Court relied on this Court's pronouncement in *Henry* that, although it was overruling *Johnson*—which concerned "female officers routinely and incidentally observing [male inmates] in various states of undress in their prison cells, showers, and toilets"—its result "would have been no different under a reasonableness analysis, given the limited nature of the intrusions at issue and the ever-present institutional concerns over safety and security." *Henry*, 969 F.3d at 783 (discussing *Johnson v. Phelan*, 69 F.3d

144, 145-46 (7th Cir. 1995)).  However, a review of *Johnson* makes clear that its core holding with respect to reasonableness was—as almost precisely predicted a year earlier in *Canedy*—that "sex is not a bona fide occupational qualification preventing women from working in all-male prisons, and that pat-down searches and occasional or inadvertent sighting by female prison employees of inmates in their cells or open showers do not violate the inmates' right to privacy." *Canedy*, 16 F.3d at 187; *Johnson*, 69 F.3d at 147-48 (holding that "cross-sex monitoring reduces the need for prisons to make sex a criterion of employment" and "makes good use of the staff").

Put another way, *Johnson*—particularly in light of *Canedy* and *Henry*—primarily stands for the proposition that, given "the needs and exigencies of the institutional environment" (*Canedy*, 16 F.3d at 185), there is no constitutional "right not to be seen" occasionally or inadvertently "by the other sex" (*Johnson*, 69 F.3d at 148).  But, as noted in *Canedy*, "where this observation is more intrusive (like a strip search, in the absence of an emergency) or a regular occurrence," the right to bodily privacy is still implicated (and protected).  *Canedy*, 16 F.3d at 187.

Here, as previously stated, the invasion of the right to bodily privacy at issue is (1) one of the most extreme invasions imaginable, (2) much more than a passing, inadvertent glance,[5] (3) occurs in a manner that provides Pretrial Detainees with no ability to cover themselves, and (4) entirely unnecessary since, in some Holding

---

[5] Indeed, while the Camera feeds may not be constantly observed, they are constantly recording, and, as noted above, it is the recording that constitutes the invasion of privacy. *See*, Section I-A-3, *supra*.

Cells, Defendants can, and do, accomplish the same security goals without needing to record and/or view Pretrial Detainees using the toilet at all. *See*, Sections I-A and I-B-2. Therefore, unlike *Johnson*, where the invasions of privacy could fairly be described as a "necessarily evil" of the institutional environment, Defendants' use of the Cameras to record every Pretrial Detainee using the toilet is highly disproportionate and unreasonable in comparison to whatever security interest Defendants may have for monitoring the Holding Cells generally.

Finally, the concept that some things are off-limits, even in a location generally subject to a search, is a generally recognized principle of Fourth Amendment law. For example, when law enforcement obtains a warrant to search a particular location, "the scope of the search" must be limited "to areas where [the] items [sought to be located] are likely to be discovered." *E.g.*, *United States v. Mann*, 592 F.3d 779, 782 (7th Cir. 2010) (citing *Platteville Area Ap't. Ass. v. City of Platteville*, 179 F.3d 574, 579 (7th Cir. 1999)); *Horton v. California*, 496 U.S. 128, 140 (1990).

Consistent with this principle, this Court's conclusions in *Henry*, *Canedy*, and the other cases cited above all necessarily recognize that—even in a place where "official surveillance has traditionally been the order of the day" (*Lanza v. New York*, 370 U.S. 139, 143 (1962))—at least some expectation of privacy continues to exist. *E.g.*, *Henry*, 969 F.3d at 779; *Canedy*, 16 F.3d at 185-86. Here, in the same way that a search warrant does not give law enforcement *carte blanche* to engage in "general exploratory rummaging through one's belongings," whatever security interest Defendants have in recording the Holding Cells does not give them

unbridled authority to record Pretrial Detainees while using the toilet. *See, e.g.*, *Mann*, 592 F.3d at 782.

In sum, "the seriousness of the intrusion on" Plaintiffs' right to bodily privacy "is such as to necessitate some reasoned criteria for determining which arrestees pose" a risk to security before they can be recorded "while using bathroom facilities." *Wilkes*, 696 F. Supp. at 150. Defendants' failure to articulate any such criteria— other than some vague notion of security—makes clear that their policy of recording Pretrial Detainees while using the toilets in the Holding Cells "is simply unreasonably intrusive, as measured by the interests it was designed to serve." *Wilkes*, 696 F. Supp. at 150. Therefore, Defendants' searches were unreasonable, even when balanced against their interests in security.

### 4. The Location of the Searches Supports a Finding of Unreasonableness.

As set forth in Section I-A-1, *supra* the searches at issue in this case occurred in the one place in the Holding Cells where a limited amount of privacy might have been achieved: the location designated for some of the most private and personal acts, including bathroom use and personal hygiene. *See, e.g.*, *Wilkes*, 696 F. Supp. at 147; *DiLoreto*, 744 F.Supp. at 620. The combination of the extensive, invasive, uncensored, secretive search in the only place where Plaintiffs might have expected to achieve a measure of privacy while being confined for long hours in Holding Cells prior to their day in court—and the absence of any justification for conducting this search or any evidence that Defendants obtain any security benefit from these unreasonable searches—compels a conclusion that Defendants' conduct constituted

an unreasonable search.  Therefore, this Court should reverse the grant of summary judgment in Defendants' favor with respect to Plaintiffs' Section 1983 claim.

## II.   THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT IN DEFENDANTS' FAVOR WITH RESPECT TO PLAINTIFFS' INTRUSTION UPON SECULUSION CLAIM.

As with Plaintiffs' Section 1983 claim, the District Court held that Plaintiffs' intrusion upon seclusion claim failed because Plaintiffs lacked a reasonable expectation of privacy while in the Holding Cells.  (A.17-18).  For the same reasons set forth above, this conclusion was in error.  *See*, Section I, *supra*.

Nevertheless, it is important to note that, to the extent that the Court affirms the District Court's grant of summary judgment in Defendants' favor with respect to Plaintiffs' Section 1983 claim on the grounds that video recording cannot constitute a search within the contemplation of the Fourth Amendment, it should still reverse the District Court's decision with respect to Plaintiffs' intrusion upon seclusion claim.  Indeed, as discussed above, under Illinois law, an invasion of privacy claim can be premised upon recordation alone.  *Amati*, 829 F.Supp. at 1010.  Accordingly, the District Court's grant of summary judgment in Defendants' favor with respect to Plaintiffs' intrusion upon seclusion claim should be reversed.

## III.   THE DISTRICT COURT ERRED IN REFUSING TO GIVE PLAINTIFFS AN ADEQAUTE OPPORTUNITY TO CONDUCT DISCOVERY.

As set forth in Sections I and II, *supra*, based on the record, as it currently stands, the District Court's grant of summary judgment in Defendants' favor should be reversed. First, the MSJ Order is devoid of any reference to *which* specific security concerns where promoted by Defendants' use of the Cameras to record

Pretrial Detainees while using the toilets in the Holding Cells, or precisely *how* Defendants' use of the Cameras in this way was necessary to do so. It is clear that *Defendants* failed to meet their burden of proof in connection with the MSJ. *See, e.g.*, *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014) (Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary.").

Second, to the extent that Defendants did meet their burden of production on specific issues, Plaintiffs have produced sufficient evidence to establish a genuine dispute of material fact exists with respect to those issues. *See, e.g.*, *Daugherty v. Page*, 906 F.3d 606, 609-10 (7th Cir. 2018). For example, Hecker's testimony, at the very least, demonstrates the existence of a genuine issue of material fact as to whether Defendants had a legitimate security interest justifying their use of the Cameras to record Pretrial Detainees while using the toilets in the Holding Cells. (A.27). Although the District Court refused to consider Hecker's testimony on the grounds that Hecker lacked "policy-making authority" (A.16), this was in error, and, as such, summary judgment in Defendants' favor was unwarranted.

Third, while some of the issues discussed above are issues of fact—such as whether Plaintiffs' expectation of privacy while in the Holding Cells was one that society is willing to deem as reasonable (*See, e.g.*, *Scott*, 731 F.3d at 664 (noting that whether an individual's "expectation of privacy...was reasonable for Fourth

Amendment purposes is necessarily fact dependent") (quotations omitted))[6]—the District Court appeared to decide them as a matter of law (A.14). Accordingly, to the extent that the District Court "did not perform a [proper] analysis" with respect to reasonableness or some other issue, summary judgment should be reversed so that the "District Court [can] perform [that analysis] in the first instance on remand." *See, e.g.*, *Henry*, 969 F.3d at 784.

Although, for these reasons, reversal of the District Court's grant of summary judgment, on the record, as it currently stands, is proper, it is nevertheless important to note that, in the proceedings below, Plaintiffs were not given an adequate opportunity to conduct discovery before opposing the MSJ, as explained below. Therefore, even if this Court believes that summary judgment was proper because Plaintiffs failed to proffer sufficient evidence on a particular point, it should still reverse the District Court's grant of summary judgment in Defendants' favor, and remand these proceedings to the District Court for completion of discovery before addressing the issue of summary judgment. *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996) (reversing grant of summary judgment where the "denial of discovery resulted in actual and substantial prejudice to the complaining litigant") (quotations omitted).

To explain, it is necessary to provide this Court with a brief summary of the course of the proceedings in this case. As was set forth in detail in the Declaration of

---

[6] Indeed, when societal standards are at issue, it is typically the jury's province to determine precisely what those standards are. *See, e.g.*, *United States v. Langford*, 688 F.2d 1088, 1092 (7th Cir. 1982).

Thomas Zimmerman—which was submitted in connection with Plaintiffs' response to the MSJ—prior to the filing of the MSJ, the District Court had limited the scope of discovery to only class certification related discovery, before closing class discovery in March 2020. (A.34-35). Thereafter, the parties proceeded to brief two motions for class certification, which were both denied without prejudice because the District Court believed it to be in the interest of judicial economy to consider the issue of summary judgment (with respect to Plaintiffs' individual claims) first. (A.83-84, A.314-316).

While this may have been a permissible, albeit unorthodox, manner in which to advance the case, it led to a situation where Plaintiffs were required to oppose a motion for summary judgment without ever being permitted to engaged in full fact discovery with respect to their individual claims—a fact Plaintiffs noted in opposing Defendants' request to proceed to briefing on the MSJ. (A.321-322 (noting that Plaintiffs would require additional discovery with respect to their individual claims if the matter proceeded to briefing on summary judgment)). Indeed, as noted above, to that point, the District Court had only authorized class certification related discovery.

In addition, even with respect to the class discovery performed, Defendants repeatedly obfuscated, delayed, and avoided their discovery obligations, which necessitated several motions to compel, motions for sanctions, and motions to extend the discovery deadlines. (A.332-809). Even though some these motions were granted, Defendants still had yet to provide Plaintiffs with outstanding class

discovery at the time class discovery was closed, which—in conjunction with the fact that the parties had yet to even engage in discovery with respect to Plaintiffs' individual claims—severely prejudiced Plaintiffs' ability to contest the MSJ. (A.321-322, A.332-750).

For this reason, in the proceedings below, Plaintiffs argued that Defendants' MSJ should be denied pursuant to Fed. R. Civ. P. 56(d), so that they could be afforded an opportunity to conduct full discovery on the facts underlying their individual claims.  (A.34-35).  Yet, despite concluding that "Plaintiffs fail[ed] to create a genuine issue of material fact" in opposition to the MSJ, the District Court made no mention of why such was the case, or Plaintiffs request to conduct additional discovery pursuant to Fed. R. Civ. P. 56(d). (A.18).  Therefore, even if this Court believes that the District Court's grant of summary judgment in Defendants' favor was proper based on the record before it, it should still reverse the MSJ Order, and remand these proceedings to the District Court for completion of discovery. *Gile*, 95 F.3d at 499.

## IV.   THE DISTRICT COURT ABUSED ITS DISCRETION IN CONSIDERING PLAINTIFFS' DISCOVERY RELATED MOTIONS.

As explained in Sections I-A and B of Plaintiffs' Statement of the Case, Defendants repeatedly failed to produce documents during discovery and competent witnesses for depositions, even after being explicitly ordered to by Judge Valdez. This necessitated three motions to compel, a motion for sanctions, a motion to take additional Rule 30(b)(6) depositions, and a petition for an award of attorneys' fees, all of which were brought pursuant to Fed. R. Civ. P. 37.  (A.332-809). As explained

below, however, the District Court abused its discretion in considering these motions.

### A.     The District Court Failed to Consider Plaintiffs' Petition for an Award of Attorneys' Fees Brought in Connection with Their First Two Motions to Compel.

Pursuant to Fed. R. Civ. P. 37, reasonable attorneys' fees and expenses may be awarded when a motion to compel is granted, or granted in part, regarding the failure of a party to make the required Rule 26(a) disclosures, the failure of a corporation or other entity to make a designation under Rule 30(b)(6), the failure of a party to answer an interrogatory submitted under Rule 33, or the failure of a party to produce documents. Fed. R. Civ. P. 37(a)(3)(A) and (B)(ii-iv).  If a motion to compel under Rule 37(a) is granted in part and denied in part, the Court may, "*after giving an opportunity to be heard*," apportion the reasonable expenses for the motion. Fed. R. Civ. P. 37(a)(5)(C) (emphasis added).  Although, unlike Rule 37(a)(5)(A), Rule 37(a)(5)(C) is discretionary, "the analysis underlying a decision under either subsection is the same and the arguments pertaining to exceptions under Rule 37(a)(5)(A) are equally applicable to the determination of whether fees and costs should be apportioned under Rule 37(a)(5)(C)." *E.g.*, *Barlow v. Herman*, 2015 WL 846568, at *3 (D. Nev. 2015).

In other words, Rule 37 "presumptively requires every loser to make good the victor's costs." *Rodriquez v. Parsons Infrastructure & Tech. Grp., Inc.*, 271 F.R.D. 620, 623 (S.D. Ind. 2010) (citing *Rickels v. City of South Bend, Ind.,* 33 F.3d 785, 786 (7th Cir. 1994)). For this reason, "the burden of persuasion is on the losing party to avoid assessment of expenses and fees, rather than on the winning party to obtain

such an award." *Zimmer, Inc. v. Beamalloy Reconstructive Med. Prod., LLC*, 2019
WL 1318094, at *11–12 (N.D. Ind. 2019) (citing *Lincoln Diagnostics, Inc. v.
Panatrex, Inc.*, 2008 WL 4330182, at *3 (C.D. Ill. 2008)).

Here, Judge Valdez granted, in part, Plaintiffs' first two motions to compel.
(A.526-529).  Accordingly, on April 8, 2019, Plaintiffs filed a *Petition for Fees
Related to Motions to Compel* ("Fee Petition"), arguing that, pursuant to Fed. R. Civ.
P. 37, they were entitled to an award of attorneys' fees incurred in connection with
their first two motions to compel.  (A.526-692).

Although an award of attorneys' fees under Rule 37(a)(5)(C) is discretionary, the
plain language of that Rule makes clear that a Court must give a party seeking
such an award "an opportunity to be heard."  Fed. R. Civ. P. 37(a)(5)(C).  In
addition, as with Rule 37(a)(5)(A), the only grounds upon which a petition for
attorneys' fees brought pursuant to Rule 37(a)(5)(C) may be denied are whether: "(i)
the movant filed the motion before attempting in good faith to obtain the disclosure
or discovery without court action; (ii) the opposing party's nondisclosure, response,
or objection was substantially justified; or (iii) other circumstances make an award
of expenses unjust."  Fed. R. Civ. P. 37(a)(5)(A); *Barlow*, 2015 WL 846568 at *3.

Nevertheless, in the proceedings below, the District Court summarily denied
Plaintiffs' Fee Petition, without any consideration of the relevant factors as to
whether an award of attorneys' fees is warranted.  (A.330-331).  Although, in that
same April 10, 2019 order, the District Court noted that it was denying several
other discovery-related motions (discussed *infra*) on the grounds that they were

untimely, Plaintiffs' Fee Petition was based on the two *previously-granted* (and timely) motions to compel. (A.526-529). Therefore, the District Court's refusal to consider Plaintiffs' Fee Petition in accordance with the provisions of Rule 37(a)(5)(C) was in error, and, regardless of the outcome of this appeal with respect to Defendants' MSJ, the Court should remand this matter for further consideration on Plaintiffs' Fee Petition.

### B. The District Abused Its Discretion in Denying Plaintiffs' Third Motion to Compel, Motion for Sanctions, and Motion to Take Additional Depositions.

Concurrently with the filing of Plaintiffs' Fee Petition, Plaintiffs brought a third motion to compel, a motion for sanctions, and a motion for leave to take additional Rule 30(b)(6) depositions (collectively, the "Close of Discovery Related Motions"). (A.332-750). In short, these Close of Discovery Related Motions sought to remedy the prejudice caused by Defendants' failure to provide Plaintiffs with requested discovery and produce adequate witnesses for depositions as required by Fed. R. Civ. P. 30(b)(6), even after being ordered to do so by Judge Valdez, as well as Defendants' decision to renege on their agreement to complete additional depositions after the close of discovery. (A.332-750).

Since these Close of Discovery Related Motions were premised on Defendants' failure to comply with Judge Valdez's discovery orders, the District Court was permitted to, and should have, granted relief pursuant to Rule 37, which provides that, when a party fails to comply with an order to "provide or permit discovery," a court may "issue further just orders" to rectify the failure, including, but not limited to, "staying further proceedings until the order is obeyed." Fed. R. Civ. P. 37(b)(2)

47

and (c)(1); *David v. Caterpillar, Inc.*, 324 F.3d 851, 856 (7th Cir. 2003). Instead, the

District Court denied the Close of Discovery Related Motions on the grounds that

they were untimely. (A.330-331).  As set forth below, this was an abuse of

discretion.

First, it is well-settled that "a party cannot[] hold back information and

supplement at the end of discovery such that it would cause prejudice to the

opposing party." *Cummings v. Dart*, 2022 WL 461987, at *2 (N.D. Ill. 2022); *King v.

Ford Motor Co.*, 872 F.3d 833, 838 (7th Cir. 2017) (finding "obvious prejudice" where

a party's failure to disclose a witness prevented a party from deposing him "and

conducting any appropriate follow-up discovery"); *Jokich v. Rush University Medical

Center*, 2020 WL 2098060, at *4 (N.D. Ill. 2020) (finding prejudice where "late

disclosures days before the discovery cut off effectively prevented [a party] from

taking discovery during the previously-set discovery period on the new witnesses

and information provided"); *Johnson v. Statewide Investigative Servs., Inc.*, 2021

WL 825653, at *12 (N.D. Ill. 2021) ("Plaintiff suffered prejudice from receiving the

witness names on the last day of fact discovery.").  For this reason, courts routinely

reopen discovery where it is necessary to prevent prejudice associated with

receiving last-minute discovery disclosures. *E.g.*, *Cummings*, 2022 WL 461987 at *2

(collecting cases).

Such relief was warranted here, as—despite being ordered by Judge Valdez to

produce certain documentation and appear for depositions with deponents prepared

to testify—Defendants repeatedly failed to do so, before ultimately pointing to the

District Court's cutoff date as excusing those obligations entirely. (A.332-342, A.499-505, A.693-697). Yet, when Plaintiffs attempted to seek this relief from Judge Guzman, he was unwilling to grant it. (A.330-331). This was an abuse of discretion.

Second, while it is true that "district courts have wide discretion to control their docket by granting or denying motions to continue," as well as to control discovery, they nevertheless must exercise that discretion reasonably. *See, e.g.*, *Mraovic*, 897 F.2d at 270; *McCarthy*, 362 F.3d at 1012. But, such was not the case here, as Judge Guzman effectively imposed two different standards with respect to compliance with his deadlines.

With respect to Plaintiffs, Judge Guzman set an unusually short class discovery period, and, only very reluctantly, granted Plaintiffs a few limited extensions to complete discovery. (A.751, A.753). Ultimately, despite Plaintiffs' diligent efforts to complete discovery within the timeframe allotted, Judge Guzman refused to allow Plaintiffs to complete additional discovery that, but for Defendants' dilatory tactics, would have timely been completed. (A.332-342, A.499-505, A.693-697). In contrast, Defendants, despite their repeated noncompliance with Judge Valdez's orders, were granted no less than *seven* extensions of time by the District Court. (A.811).

If both parties were held to the same standard with respect to scheduling, Plaintiffs would have no reason to complain. But, the fact is that they were not, which was a clear abuse of discretion.

In sum, as a result of the District Court's abuses of discretion, Plaintiffs were denied the ability to complete the necessary discovery to oppose the MSJ. Therefore, even if this Court believes that Plaintiffs failed to meet their burden of proof in opposing the MSJ, it should nevertheless reverse the District Court's decision and remand these proceedings to the District Court for completion of the discovery to which Plaintiffs were improperly denied. *Gile*, 95 F.3d at 499.

<b><u>CONCLUSION</u></b>

For the reasons set forth herein, this Court should reverse the District Court's grant of summary judgment in Defendants' favor.  In addition (or in the alterative) to this relief, the Court should reverse the District Court's summary denial of Plaintiffs' Fee Petition, and remand this matter for further consideration of Plaintiffs' Fee Petition on the merits.

s/ Thomas A. Zimmerman, Jr.   <br>Thomas A. Zimmerman, Jr. 

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30**

In accordance with Circuit Rule 30(d), the undersigned hereby certifies that the

attached Short Appendix accompanying Plaintiff-Appellants' Opening Brief

contains all of the materials required by Circuit Rule 30(a) and (b).


s/ Thomas A. Zimmerman, Jr.
Thomas A. Zimmerman, Jr.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(G)

I, Thomas A. Zimmerman, Jr., an attorney, certify that the foregoing ***Plaintiff-Appellants' Opening Brief*** complies with Fed. R. App. P. 32(a)(7)(B)(i) and Local Rule 32(c) because it contains 13,220 words, excluding the items exempted pursuant to Fed. R. App. P. 32(f).

<u>s/ Thomas A. Zimmerman, Jr.</u>
Thomas A. Zimmerman, Jr.

## CERTIFICATE OF SERVICE

I, Thomas A. Zimmerman, Jr., an attorney, certify that I served the foregoing ***Plaintiff-Appellants' Opening Brief*** and ***Short Appendix*** upon counsel of record in this case via the U.S. Court of Appeals' CM/ECF system, on this day February 15, 2023.

s/ Thomas A. Zimmerman, Jr.
Thomas A. Zimmerman, Jr.

No. 22-2863

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

ELIZABETH ALICEA, et al.,

Plaintiffs-Appellants,

-vs-

COUNTY OF COOK and THOMAS J. DART,

Defendants-Appellees.

---

On Appeal from the U.S. District Court,
Northern District of Illinois, Eastern Division
File Number 18 cv 05381
The Honorable John F. Kness, Presiding.

---

**PLAINTIFFS-APPELLANTS' RULE 30(A) SHORT APPENDIX**

---

Thomas A. Zimmerman, Jr.
Matthew C. De Re
Zimmerman Law Offices, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020
Counsel for Plaintiffs-Appellants

## <u>Circuit Rule 30(d) Statement</u>

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the appendix.

<u>/s/ Thomas A. Zimmerman, Jr.</u>
Thomas A. Zimmerman, Jr.

## **APPENDIX**

### **Table of Contents to Short Appendix**

Judgment in a Civil Case
(entered September 30, 2022)                                      SA.1-SA.2

Memorandum Opinion and Order Granting Defendants'      SA.3-A.18
Motion for Summary Judgment
(entered September 30, 2022)

Order Denying Plaintiffs' Motion to Compel, Motion for    SA.19-SA.20
Attorney's Fees, Motion for Sanctions and Motion to Allow
Depositions (entered April 10, 2019)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ELIZABETH ALICEA, MICHELLE URRUTIA, KATINA RAMOS, and JACK ARTINIAN, individually, and on behalf of all others similarly situated, | |
| | No. 18-cv-05381 |
| Plaintiffs, | |
| | Judge John F. Kness |
| v. | |
| THOMAS J. DART, individually, and in his capacity as Sheriff of Cook County et al., | |
| Defendants. | |

### <u>JUDGMENT IN A CIVIL CASE</u>

Judgment is hereby entered (check appropriate box):

☐      in favor of plaintiff(s)
and against defendant(s)
in the amount of $                    ,

which ☐ includes        pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☒      in favor of defendant THOMAS J. DART, individually, and in his capacity as Sheriff of Cook County et al.,

and against Plaintiffs ELIZABETH ALICEA, MICHELLE URRUTIA, KATINA RAMOS, and JACK ARTINIAN, individually, and on behalf of all others similarly situated, with prejudice.

Defendants shall recover costs from plaintiff.

---

☐      other:

---

This action was *(check one)*:

☐ tried by a jury with Judge        presiding, and the jury has rendered a verdict.
☐ tried by Judge        without a jury and the above decision was reached.
☒ decided by Judge John F. Kness on defendant's motion for summary judgment (Dkt. 167).

**SA.01**

SO ORDERED in No. 18-cv-05381.

Date: September 30, 2022

_____

JOHN F. KNESS
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ELIZABETH ALICEA, MICHELLE URRUTIA, KATINA RAMOS, and JACK ARTINIAN, individually, and on behalf of all others similarly situated, | No. 18-cv-05381 |
| Plaintiffs, | Judge John F. Kness |
| v. | |
| THOMAS J. DART, individually, and in his capacity as Sheriff of Cook County et al., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

The Cook County Sheriff's office uses a video surveillance system to oversee the Cook County Department of Corrections, Cook County courthouses, and other County or Sheriff's Office-operated facilities. Those cameras also provide surveillance of cells used to hold detainees as they are transported to and from court. Some of those cameras permit surveillance of the toilet area of the detention cells.

Plaintiffs are former pretrial detainees who were held at various times in three Cook County courthouse holding cells. Plaintiffs allege that, by allowing surveillance of bathroom areas, the Sheriff's video surveillance system violates Plaintiffs' expectation of privacy in violation of the Fourth Amendment[1] and Illinois state law.

---

[1] Plaintiffs style their Fourth Amendment claim as a Fourth Amendment and Fourteenth Amendment claim. They clarify in their Response to Defendant's Motion for Summary Judgment (Dkt. 172) that the Fourteenth Amendment is the vehicle through which they

In short, Plaintiffs allege that this constant recording and storage of the video, which potentially included Plaintiffs' bathroom use, was and is an unreasonable search.

Defendants Sheriff Thomas Dart and Cook County counter that, because there is no evidence any individual saw any Plaintiff use the bathroom facilities, Plaintiffs have no evidence that they, or anyone else, were searched. But Defendants also contend that, even *if* Sheriff's personnel observed Plaintiffs use the bathroom, the search was reasonable because (1) there is no valid expectation of privacy in the semipublic holding cells; and (2) the searches were minimally invasive and did not outweigh the significant institutional safety and security concerns that the surveillance system was intended to address.

Although the Court respects Plaintiffs' desire to use the bathroom without fear of being watched, Plaintiffs' claims fail as a matter of law. For the reasons explained below, Defendants are entitled to summary judgment on both counts.

## I.    BACKGROUND

Defendant Dart operates courthouse holding cells in Cook County, Illinois, which hold detainees before and after they are sent to court. (Dkt. 169 ¶ 7.) The holding cells are arranged in various sizes and configurations, but each contains a toilet which individuals may use when held in the cell. (*Id.* ¶ 8.) A detainee's placement in a particular cell is based on a few factors, including the detainee's sex and the courtroom in which they are to appear. (*Id.* ¶ 9.)

The Sheriff's office places cameras in and around the Cook County Department

---

bring their Fourth Amendment claim (rather than a freestanding Fourteenth Amendment claim). (Dkt. 172 at 6 n.1.)

of Corrections, County courthouses, and other Sheriff's office facilities. (*Id.* ¶ 13.) The stated purpose of those cameras is to enhance security. (*Id.*) To that end, the procedures for requesting, viewing, downloading, storing, and retaining video surveillance footage from the cameras are subject to the Sheriff's Office Video Policy. (*Id.* ¶ 14.) That policy provides that video surveillance will be captured and maintained for 30 days, and if any incidents are captured on video, that the "video should be copied and retained according to established state or federal law." (*Id.* ¶ 15.) The video policy allows recordings to be viewed only by the "Video Monitoring Unit." (*Id.* ¶ 16.) Video monitors in designated locations in the Courthouses allow certain officers to view live video feeds, as needed. (*Id.* ¶ 23.) Videos will only be preserved in certain limited circumstances and may be viewed only if requested by authorized personnel. (*Id.* ¶¶ 18–20.) Improper use of video may result in termination of employment or criminal prosecution. (*Id.* ¶ 21.) The Video Policy explicitly prohibits officers from "viewing an individual's private underclothing, buttock's, genitalia, or female breasts while that individual is showering, performing bodily functions or changing clothes, unless he/she otherwise qualifies for a strip search." (*Id.* ¶ 29.)

In the Skokie courthouse, video monitors displaying the live video feeds can be viewed from two control rooms or the office of Superintendent Eric Mills. (*Id.* ¶ 24.) The video monitors in the Skokie and other courthouses display multiple video feeds (as many as 16) on one monitor at a time. (*Id.* ¶ 26.) Live video feeds from at least six of the over 250 cameras in all courthouses capture some part of the toilet in the cell, including one camera in the Skokie Courthouse, one in the Leighton Courthouse, and

one in the Rolling Meadows Courthouse. (*Id.* ¶ 28.)

Plaintiff Elizabeth Alicea was arrested and placed in a holding cell in the Skokie Courthouse in early June 2018. (*Id.* ¶ 31.) That small cell had a bench, toilet, sink, and a privacy wall that separated the toilet area from the rest of the cell but did not extend to the ceiling. (*Id.* ¶ 33.) When Alicea was in the cell, she saw the camera but did not know it could capture the toilet area and did not know whether anyone watched her use the toilet. (*Id.* ¶ 34.)

Plaintiff Michelle Urrutia was held in a holding cell in the Rolling Meadows Courthouse in 2018. (*Id.* ¶ 35.) She too saw cameras when she was in the holding cell but did not know which direction the cameras were angled or if anyone saw her use the toilet. (*Id.* ¶¶ 38–40.)

Plaintiff Katina Ramos was held in a holding cell in the Skokie Courthouse approximately nine times between October 2017 and February 2018. (*Id.* ¶ 41.) She was held in multiple cells, likely on the lower level of the courthouse. (*Id.* ¶ 43.) Each of the cells had a toilet, a partition separating the toilet from the rest of the cell, and a camera. (*Id.* ¶ 44.) Ramos could not say whether anyone viewed her while she used the toilet. (*Id.*)

Plaintiff Jack Artinian was placed in at least one holding cell in the Leighton Criminal Courthouse in April 2017 and twice in the Skokie Courthouse in June and August 2017. (*Id.* ¶¶ 45, 50, 55.) Artinian was aware that there were cameras in each of those cells but was not sure whether they could see him in the toilet areas. (*Id.* ¶¶ 48, 54.) In June, there were other detainees in the holding cell with Artinian. (*Id.*

¶ 51.) Artinian is not sure whether anyone observed him use the toilet. (*Id.* ¶ 48.)

Three of the Plaintiffs, Alicea, Urrutia, and Ramos, claim that they feel embarrassed or humiliated by the potential for someone to have seen them use the toilet in their respective holding cells. (*Id.* ¶¶ 62, 65, 69.) None of the plaintiffs alleges to have seen a doctor or psychiatrist, nor to have made any lifestyle changes because of the potential toilet viewing. (*Id.* ¶¶ 63–64, 66–67, 69–70, 72–73.)

Plaintiffs filed their class action lawsuit on August 8, 2018. (Dkt. 1.) They allege that the video surveillance of pretrial detainees that includes toilets violates the Fourth Amendment. (*Id.* ¶¶ 96–108.) Moreover, the Plaintiffs allege the surveillance is an intrusion on their seclusion under Illinois state law. (*Id.* ¶¶ 109–116.) By the previously-assigned judge, the Court initially opened class certification discovery for a four-month period to close in January 2019 before extending that deadline to March 2019. (Dkt. 21; Dkt. 85.) Then the Court denied class certification twice without prejudice. (Dkt. 133; Dkt. 147.) In June 2020, Defendants moved for summary judgment. (Dkt. 167; Dkt. 172; Dkt. 174.) For the reasons explained below, the Court grants Defendants summary judgment on both counts.

## II.    LEGAL STANDARD

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005); *see also*

Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted). All facts, and any inferences to be drawn from them, are viewed in the light most favorable to Plaintiff as the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

## III.   DISCUSSION

### A.   Fourth Amendment Claim

Until recently, the Seventh Circuit adhered to a bright-line rule that pretrial detainees and prisoners had no Fourth Amendment rights. *Johnson v. Phelan*, 69 F.3d 144, 150 (7th Cir. 1995) ("The fourth amendment does not protect privacy interests within prisons."), *overruled by Henry v. Hulett*, 969 F.3d 769 (7th Cir. 2020) (en banc). But recently, the Seventh Circuit trimmed that categorical rule and held that "the Fourth Amendment protects (in a severely limited way) an inmate's right to bodily privacy during visual inspections, subject to reasonable intrusions that the realities of incarceration often demand." *Henry*, 969 F.3d at 779. When evaluating a

pretrial detainee or prisoner's Fourth Amendment claim "regarding a strip or body cavity search, courts must assess that search for its reasonableness, considering 'the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.' " *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). That holding applies to "pretrial detainees and convicted prisoners alike." *Id.* (citing *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). Indeed, "in certain circumstances [pretrial detainees] present a greater risk to jail security and order [than convicted prisoners]." *Id.* (quoting *Bell*, 441 U.S. at 546 n.28).

*Henry* ensured the protections of the Fourth Amendment extended, in limited circumstances, to prisoners and pretrial detainees. "The 'touchstone' of the Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.' " *Henry*, 969 F.3d at 776–77 (quoting *Oliver v. United States*, 446 U.S. 170, 177 (1984)). The Fourth Amendment only protects reasonable expectations of privacy. *Id.* at 777. "Assessing whether a search violated a person's Fourth Amendment rights 'requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.' " *Id.* (quoting *Bell*, 441 U.S. at 559).

But while *Henry* focused specifically on the privacy interest of detainees in their bodies, it carefully preserved *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994), which affirmed the Supreme Court's holding in *Hudson v. Palmer* that prisoners are entitled "to no reasonable expectation of privacy in their *prison cells* insuring them of Fourth Amendment Protection against unreasonable searches and

seizures." *Henry*, 969 F.3d at 782 (emphasis added) (quoting *Canedy*, 16 F.3d at 185). Indeed, *Henry* favorably quoted from *Sparks v. Stutler* that "*Hudson* does not establish that the interior of one's body is as open to invasion as the interior of one's cell." *Id.* (quoting *Sparks v. Stutler*, 71 F.3d 259, 261 (7th Cir. 1995)); *see also Hudson*, 468 U.S. at 526 ("[The] Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell.").

*Henry* thus instructs district courts to walk a fine line, recognizing that the Fourth Amendment is applicable "to visual inspections during bodily searches" but still granting deference to prison officials to tend to "the ever-present institutional concerns over safety and security." *Henry*, 969 F.3d at 783. When evaluating the reasonableness of "a strip or body cavity search, [therefore,] . . . courts must afford prison administrators 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' " *Id.* (quoting *Bell*, 441 U.S. at 547)

There is no evidence that any member of the Sheriff's department (or anyone else) watched the video feeds while any Plaintiff used the toilet. As a result, the Court will first address whether the live video recordings, standing alone, constitute a search. The Seventh Circuit recently addressed whether twenty-four-hour cameras on telephone poles used to record a defendant's home constituted a search. *See United States v. Tuggle*, 4 F.4th 505, 525 (7th Cir. 2021). In *Tuggle*, the court noted that technology such as cameras will "eventually and inevitably permeate society" and will

pose a challenge to traditional Fourth Amendment analysis. *Id.* at 527. With some apparent hesitancy, the Court of Appeals concluded that "round–the–clock surveillance for eighteen months" of the defendant's home using pole cameras did not constitute a search in violation of the Fourth Amendment. *Id.* at 528–29. In doing so, the court distinguished the government's use of "real–time video footage" captured by the pole cameras from "an expansive, pre-existing database of video footage." *Id.* at 525.

As in *Tuggle*, the mere fact here of a live video feed, without any evidence of someone watching it, is insufficient to constitute a search. That is particularly true given that there were no corrections officers assigned to watch the monitors, and that the Video Policy explicitly prohibited viewing an individual's "private underclothing, buttock's, genitalia, or female breasts while that individual is showering, performing bodily functions, or changing clothes, unless he/she qualifies for a strip search." (Dkt. 169 ¶¶ 23, 29.) Although the Seventh Circuit has yet to squarely decide whether video recording alone, without any observer, constitutes a search for pretrial detainees, *Tuggle* arguably suggests it does not.[2]

Plaintiffs rely on *Arnzen v. Palmer*, 713 F.3d 369 (8th Cir. 2013), to support their contention that the mere act of recording constitutes a search. (Dkt. 172 at 7.) The *Arnzen* plaintiffs—involuntarily committed sex offenders—sought a preliminary injunction enjoining the state authorities from using unmonitored cameras to record

---

[2] To be sure, the cameras here, which recorded the jail–cell toilets, may have "created a potential for an invasion of privacy." *United States v. Karo*, 468 U.S. 705, 712 (1984). But "potential, as opposed to actual, invasions of privacy [fail to] constitute searches for purposes of the Fourth Amendment." *Id.*

them in single-occupant bathrooms. *Arnzen*, 713 F.3d at 372. Plaintiffs contend that the Eighth Circuit held that "'capturing images,' in itself, 'violated patients' reasonable expectation of privacy . . . irrespective of whether there is some chance that those images will not be viewed.'" (Dkt. 172 at 8 (quoting *Arnzen*, 713 F.3d at 372–73).) Yet, as Defendants point out, the Eighth Circuit "believe[d] . . . that single-person bathrooms . . . are inherently different from cells" because the former are used for "functions 'traditionally shielded by great privacy.'" *Arnzen*, 713 F.3d at 373 (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 658 (1995)). Although the Eighth Circuit held that unviewed recordings may constitute a search, that holding is of less import here when applied to jail cells.

Because there is no authority directly deciding whether unviewed jail-cell recordings constitute a search under the Fourth Amendment, the Court will analyze Plaintiffs' claims operating under the most favorable disposition to Plaintiffs—that regardless of whether anyone watched the video feeds, the feeds themselves constitutes a search.[3] But even making such an assumption, Plaintiffs' Fourth Amendment claim fails on the merits.

Although the Court assumes a search occurred, that "does not mean that Plaintiffs are necessarily entitled to a trial on their Fourth Amendment claim." *Henry*, 969 F.3d at 784. Plaintiffs still must provide evidence that the searches were unreasonable, "considering 'the scope of the particular intrusion[s], the manner in

---

[3] Similarly, the Court will assume without deciding that each Plaintiff occupied a cell from which they could be viewed on the toilet. Only Alicea submitted evidence in support of that contention. (Dkt. 169 ¶ 34.)

which [they were] conducted, the justification for initiating [them], and the place in which [they were] conducted.' " *Id.* (alterations in original) (quoting *Bell*, 441 U.S. at 559). A reasonable expectation of privacy "exists when: (1) the claimant exhibits an actual (subjective) expectation of privacy; and (2) the expectation is one that society is prepared to recognize as reasonable." *Doe v. Heck*, 327 F.3d 492, 511 (7th Cir. 2003); *see also Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 326, 339 (2012) (recognizing that because the "difficulties of operating a detention center must not be underestimated by the courts," even invasive search procedures "struck a reasonable balance between inmate privacy and the needs of the institutions").

Ultimately, the issue is whether Plaintiffs' privacy interest in question is closer to the physical-cavity strip-search in *Henry* or the general lack of privacy interest in a prison cell. *Henry* elaborated that "body cavity 'searches must be conducted in a reasonable manner.' " 969 F.3d at 782 (quoting *Canedy*, 16 F.3d at 186*). Henry* further recognized that even mere visual body inspections qualify as searches for Fourth Amendment purposes. *Id.* at 783. But in doing so*, Henry* reaffirmed the result in *Johnson*, even though the court backed away from *Johnson*'s categorical rule against finding Fourth Amendment rights in prisons. *Id.* (citing *Johnson*, 69 F.3d at 145). The cross-gender viewing of prisoners in "various states of undress in their prison cells, showers, and toilets" at issue in *Johnson* now constituted a Fourth Amendment search, but the Seventh Circuit found that search reasonable. *Id.* ("We do note, however, that the result in *Johnson* would have been no different under a reasonableness analysis, given the limited nature of the intrusions at issue and the

ever-present institutional concerns over safety and security.").

Accordingly, the Court holds that the potential for authorized employees to "routinely and incidentally" view pretrial detainees in "various states of undress in their prison cells, showers, and toilets" is reasonable. *Id.* Plaintiffs admit that they were aware that video cameras were present in their holding cells. (Dkt. 169 ¶¶ 34, 38, 48, 54.) Moreover, an "arrest itself result[s] in a diminished expectation of privacy on the part of the defendants." *United States v. Paxton*, 848 F.3d 803, 811 (7th Cir. 2017); *see Hudson*, 468 U.S. at 526 ("[S]ociety is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell."). In *United States v. Paxton*, for example, the Seventh Circuit held that even when "defendants' surroundings"—the inside of a police van partitioned by plexiglass windows—"may have lulled them into assuming, mistakenly, that their discussions could not be overheard," the "security function" of that vehicle put detainees on notice that they may be watched. *Paxton*, 848 F.3d at 811. So too with pretrial detainees placed in a jail cell in which they acknowledge cameras are present. Plaintiffs' lack of a reasonable expectation of privacy in their cells is fatal to their Fourth Amendment claim.

Moreover, even if Plaintiffs had an expectation of privacy, Defendant Dart had "legitimate reasons, wholly consistent with the public interest, for monitoring individuals [he] has taken into [hi]s custody," that justify the intrusion. (Dkt. 168 at

10 (quoting *Paxton*, 848 F.3d at 813).) Whether a search is reasonable "depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *Grady v. North Carolina*, 575 U.S. 306, 310 (2015).

Sheriff's Department employees are strictly limited in their ability to view live feeds. (Dkt. 169 ¶ 20.) Employees are limited to certain access levels, which control access to the feeds and provides an audit trail. (*Id.* ¶ 17.) Improper use of video feeds may result in termination or criminal prosecution. (*Id.* ¶ 21.) Indeed, one such limitation is the prohibition against viewing detainees' genitals, if visible, while they are using the toilet. (*Id.* ¶ 29.) The Video Policy more broadly is meant to address emergency incidents as they occur for the benefit of either the Sheriff's staff or detainees in the event corroboration is needed. (*Id.* ¶¶ 19, 23.)

Plaintiffs largely rely on the deposition testimony of Deputy Sheriff Patrick Hecker. (*See*, *e.g.*, Dkt. 172 at 3.) Hecker testified that he was not aware of a valid security reason to monitor detainees while on the toilet. (*Id.* at 18.) Hecker also testified that he was unaware of any weapon or contraband used by someone on the toilet in a holding cell. (*Id.*) Defendants counter that Hecker has no policy-making authority and no first-hand knowledge of whether any of the Plaintiffs were recorded on the toilet. (Dkt. 174 at 5, 11.)

Although Plaintiffs' concerns, which rely upon Hecker's testimony, are superficially attractive, courts "must accord substantial deference to the professional judgment of prison *administrators*, who bear a significant responsibility for defining

the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010) (emphasis added) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003))." Defendants have implemented valid security measures that redound to the benefit of Sheriff's employees, corrections officers, and (potentially) detainees. Accordingly, even if Plaintiffs enjoyed a right to privacy, Defendants had a legitimate reason to use the video surveillance system. The Court thus grants summary judgment in favor of Defendants on Plaintiffs' Fourth Amendment claim.

### B.    Intrusion Upon Seclusion

To prevail on an intrusion upon seclusion claim under Illinois law, Plaintiffs must establish "(1) the defendant committed an unauthorized intrusion or prying into the plaintiff's seclusion; (2) the intrusion would be highly offensive or objectionable to a reasonable person; (3) the matter intruded on was private; and (4) the intrusion caused the plaintiff anguish and suffering." *Spiegel v. McClintic*, 916 F.3d 611, 618–19 (7th Cir. 2019) (quoting *Busse v. Motorola, Inc.*, 813 N.E.2d 1013, 1017 (Ill. App. Ct. 2004)).

Illinois courts suggest analyzing the third element first, because that is "the predicate for the other elements, and as such, if this element is not proven, th[e] court need not reach the other elements." *Jacobson v. CBS Broadcasting, Inc.*, 19 N.E.3d 1165, 1181 (Ill. App. Ct. 2014). In analyzing the third element, Illinois courts look to the reasonable expectation of privacy in a particular circumstance. *See id.* at 1181. Where courts find a diminished expectation of privacy, a claim of intrusion on

seclusion likely fails. *Id.* ("Our analysis in this case begins and ends with the privacy element. We conclude that (1) the plaintiff cannot reasonably be said to have had a legitimate expectation of privacy or seclusion . . . .").

As explained above, prisoners are entitled "to no reasonable expectation of privacy in their prison cells insuring them of Fourth Amendment Protection against unreasonable searches and seizures." *Henry*, 969 F.3d at 782 (quoting *Canedy*, 16 F.3d at 185). Indeed, the "Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *See Hudson*, 468 U.S. at 526. Plaintiffs offer no binding precedent establishing a reasonable expectation of privacy in their cells, particularly given their knowledge that cameras were in their cells.[4] As a result, the Court grants summary judgment for Defendants on the Plaintiffs' intrusion upon seclusion claim.

## IV. CONCLUSION

Plaintiffs fail to create a genuine issue of material fact, and their claims fail as a matter of law. Defendants are therefore granted summary judgment on both counts.

---

[4] Plaintiffs also struggle to meet the Fourth element. Indeed, courts in this District have routinely rejected intrusion upon seclusion claims and have granted summary judgment to defendants where plaintiffs have failed to offer any evidence beyond their own testimony. *See Minter v. AAA Cook Cnty. Consol., Inc.*, 2004 WL 1630781, at *7 (N.D. Ill. July 19, 2004) (granting summary judgment to the defendant on an Illinois intrusion upon seclusion claim where "[t]he extent of plaintiff's evidence is her own statement that she felt 'angry, humiliated, frustrated and embarrassed.' This is insufficient as a matter of law"); *see also Messina v. Green Tree Serv., LLC*, 210 F. Supp. 3d 992, 1009 (N.D. Ill. 2016) (granting summary judgment to the defendants on Illinois intrusion upon seclusion claim where plaintiffs "presented no evidence of their alleged anguish and suffering other than their own say-so" and "[m]ore is needed for a plaintiff to prove actual injury").

SO ORDERED in No. 18-cv-05381.

Date: September 30, 2022

JOHN F. KNESS
United States District Judge

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Elizabeth Alicea, et al., individually and | ) | |
| on behalf of all others similarly situated , | ) | |
| **Plaintiffs,** | ) | **No: 18 C 5381** |
| | ) | |
| **v.** | ) | |
| | ) | **Judge Ronald A. Guzmán** |
| County of Cook and Thomas Dart, | ) | |
| **Defendants.** | ) | |

### ORDER

For the reasons stated below, Plaintiffs' motion to compel [101], motion for attorney's fees [103], motion for sanctions [105], and motion to allow depositions of Defendants' Rule 30(b)(6) witnesses to proceed after the class discovery deadline [107] are denied.  Presentment date of April 10, 2019 at 9:30 a.m. is stricken and the parties need not appear.

### STATEMENT

On September 13, 2018, this Court initially ordered class discovery to close on January 14, 2019, with the express statement that there would be "NO EXTENSIONS."  On October 19, 2018, the Court granted Defendants' motion to extend the deadline by thirty days to February 13, 2019 to accommodate defense counsel's schedule.  New counsel substituted in for Defendants on January 14, 2019.  On February 12, 2019, Plaintiffs filed an emergency motion for a "limited" extension of the class-discovery deadline so that Defendants could respond to outstanding interrogatories and document requests, and "for the two [Rule 30(b)(6)] depositions noticed by Plaintiffs."  The Court granted the motion with the admonition that it was a "FINAL EXTENSION."  Plaintiffs now move to allow Rule 30(b)(6) depositions to proceed after the class-discovery cut-off date of March 15, 2019, citing an agreement between the parties and the fact that Defendants "designated six superintendents and three additional witnesses to testify regarding the Rule 30(b)(6) deposition topics, which made it impossible to complete [the depositions] in a single day."  (Pls.' Mot., Dkt. # 107, at 13.)  While Plaintiffs contend that it was Defendants' dilatory conduct that caused the delays, the Court gave the parties from September 13, 2018 to March 15, 2019, six months, to complete class discovery.  This is more than enough time.  Magistrate Judge Valdez cautioned the parties that they were bound by a strict deadline and set a schedule in open court on March 5, 2019 for the parties to complete the depositions.  (Pls.' Mot., Ex. 12, Dkt. # 107-12, at 30.)  Apparently, at some point, Defendants designated numerous individuals as Rule 30(b)(6) witnesses, and Plaintiffs were "unable" to depose all of them.  Plaintiffs relied, to their detriment, on an agreement with defense counsel that the remaining Rule 30(b)(6) depositions would occur after the class-discovery cut-off date. Plaintiffs' counsel is reminded that the parties are bound by orders of the Court, not by agreements with the opposing party.

The same analysis applies to Plaintiffs' motion to compel, which was filed on April 8, 2019. Plaintiffs should have sought relief for any purported outstanding discovery requests by the end of class discovery, which was March 15, 2019. That Plaintiffs did not find out that they were missing certain documents or items until the Rule 30(b)(6) depositions, which took place two days before and on the last day of the close of class discovery, is not a basis on which this Court will provide relief. As noted, Plaintiffs were well aware of the class-discovery deadline imposed by this Court and scheduled last-minute depositions at their own peril. The motions for sanctions and for attorney's fees are, therefore, also denied.

**Date**: April 10, 2019

**Ronald A. Guzmán**
**United States District Judge**

2